MARC J. FAGEL (Cal. Bar No. 154425)
MARK P. FICKES (Cal. Bar No. 178570)
  fickesm@sec.gov
SUSAN F. LAMARCA (Cal. Bar No. 215231)
  lamarcas@sec.gov
MICHAEL E. LIFTIK (Cal. Bar No. 232430)
  liftikm@sec.gov
KASHYA K. SHEI (Cal. Bar No. 173125)
  sheik@sec.gov
SHEILA E. O'CALLAGHAN (Cal. Bar No. 131032)
  ocallaghans@sec.gov

Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
44 Montgomery Street, Suite 2600
San Francisco, California  94104
Telephone:  (415) 705-2500
Facsimile:  (415) 705-2501

## UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | Case No. _____ |
| Plaintiff, | |
| vs. | COMPLAINT |
| SUNWEST MANAGEMENT, INC., CANYON CREEK DEVELOPMENT, INC., CANYON CREEK FINANCIAL, LLC, and JON M. HARDER, | |
| Defendants, | |
| and | |
| DARRYL E. FISHER, J. WALLACE GUTZLER, KRISTIN HARDER, ENCORE INDEMNITY MANAGEMENT LLC, SENENET LEASING COMPANY, FUSE ADVERTISING, INC., KDA CONSTRUCTION, INC., CLYDE HAMSTREET, and CLYDE A. HAMSTREET & ASSOCIATES, LLC, | |
| Relief Defendants. | |

Plaintiff Securities and Exchange Commission ("Commission") alleges:

## SUMMARY OF THE ACTION

1.      The recent collapse of a real estate enterprise once valued at approximately $2 billion in assets, run by Sunwest Management Inc. ("Sunwest") and its CEO, Jon M. Harder ("Harder"), revealed a massive fraud that led to losses of hundreds of millions of dollars for investors.  Sunwest, Harder and certain related entities operate several hundred retirement homes nationwide.  From January 2006 through June 2008, they raised at least $300 million from more than 1300 investors, primarily through the sale of tenancy-in-common interests ("TICs").

2.      Investors in the TICs were told they were purchasing ownership interests in a specific retirement home that would generate enough profit to pay a 10 percent annual return, and that Sunwest had a history of never missing a payment.  These representations misstated the true nature of the investment, and concealed the risk to investors from Sunwest's precarious financial position.

3.      Contrary to representations that individuals were obtaining an interest in a specific property which would generate a steady income stream, Defendants ran Sunwest as a single, integrated enterprise, commingling all investor funds and operational revenue into essentially a single fund from which all operating expenses and investor returns were paid.  Contrary to Defendants' representations, including written representations and marketing pitches, Sunwest paid investors steady returns on their investments not from successful management of a particular property, but from cash generated in the operations of other facilities, from funds obtained in refinancings, from loans from Harder and Harder's friends, and from funds raised through offerings to new investors.  None of these facts were disclosed to investors.

4.      By misrepresenting the true nature of the operation, Sunwest and Harder concealed the fact that the supposed profitability of each TIC investment was largely dependent on the success of other properties, the continuing availability of credit for future refinancings, and Harder's ability to raise new money or borrow from friends.  More significantly, by commingling the operating funds and money raised from investments and financings, Sunwest hid the fact that, far from consistently

turning a profit, more than half of the properties were losing money, making Sunwest a far riskier proposition than investors were led to believe.

5.       As the national credit markets tightened in 2007 and 2008, the house of cards Harder had built came crashing down on unsuspecting investors.  Despite the dire financial condition, defendants continued to raise additional money from investors.  By June 2008, they operated Sunwest virtually as a Ponzi scheme:  money raised in the final offerings (supposedly for new properties) was used to pay old investors their 10 percent return and otherwise fund operations at existing facilities. Despite Sunwest's dire financial situation, Harder took tens of millions of dollars out of the enterprise.

6.       As of January 2009, over 100 retirement homes have been placed in foreclosure, receivership or bankruptcy, resulting in the effective elimination of the TIC investors' interests in them.  For instance, in November 2008, seven TIC investor homes were sold in bankruptcy.  The proceeds from those sales were used to pay certain Sunwest creditors while the TIC investors received nothing.  Because there are multiple legal proceedings in several different jurisdictions, there is a significant risk that the piecemeal resolution of the myriad of state and federal proceedings will impinge on the ability of investors to recover.

7.       Defendants Sunwest, Harder, Canyon Creek Development, Inc. ("CCD"), and Canyon Creek Financial ("CCF") have violated, and continue to violate, the antifraud provisions of the federal securities laws in connection with the purchase or sale of securities.  In addition to the emergency relief requested by the Commission in its *Ex Parte* Application for a Temporary Restraining Order filled concurrently with the complaint, the Commission seeks an order preliminarily and permanently enjoining them from further conduct that violates the securities laws and requiring them to disgorge their ill-gotten gains, with prejudgment interest.  The Commission also seeks an order requiring Defendants to pay civil money penalties.

8.       In addition to the emergency relief requested by the Commission in its *Ex Parte* Application for a Temporary Restraining Order, the Commission further seeks disgorgement of all ill gotten gains disbursed to Relief Defendants Darryl E. Fisher, J. Wallace Gutzler, Kristin Harder,

Encore Indemnity Management LLC, Senenet Leasing Company, Fuse Advertising, Inc., KDA Construction, Inc., Clyde Hamstreet, and Clyde A. Hamstreet & Associates, LLC.

## JURISDICTION, VENUE AND INTRADISTRICT ASSIGNMENT

9.      This Court has jurisdiction over this action pursuant to Sections 20(b), 20(d) and 22(a) of the Securities Act of 1933 (the "Securities Act") [15 U.S.C. §§ 77t(b),77t(d) and 77v(a)] and Sections 21(d), 21(e) and 27 of the Securities Exchange Act of 1934 (the "Exchange Act") [15 U.S.C. §§ 78u(d), 78u(e) and 78aa].

10.     Defendants, directly or indirectly, have made use of the means and instrumentalities of interstate commerce or of the mails in connection with the acts, transactions, practices and courses of business alleged in this Complaint.

11.     Venue in this District is proper pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27 of the Exchange Act [15 U.S.C. § 78aa] because acts and transactions constituting violations alleged in this Complaint, including the offer and sale of securities, occurred within the District of Oregon.

12.     Assignment to the Eugene Division of this Court is proper because a substantial part of the events or omissions that give rise to claims alleged in this Complaint occurred in Salem, Oregon in Marion County.

## DEFENDANTS

13.     Jon M. Harder ("Harder"), age 44, resides in Salem, Oregon, and is the founder, Chief Executive Officer ("CEO") and President of Defendant Sunwest Management Inc.  Harder resigned his positions in around January 2009.  Harder is majority owner of Defendants Sunwest Management, Inc., and Canyon Creek Development, Inc.  Harder is also the sole owner of Defendant Canyon Creek Financial, LLC.  Harder also owns interests in limited liability companies which, wholly or in part, own the individual retirement facilities managed by Defendant Sunwest Management, Inc.

14.     Sunwest Management, Inc. ("Sunwest") is an Oregon corporation formed in 1992 with a principal place of business in Salem, Oregon.  Defendant Harder owns a 75 percent interest in Sunwest.  Around 2001, Sunwest began raising money from investors to fund its expanding

operations. At its peak in around 2007, Sunwest managed over 320 retirement facilities in 34 states, with assets valued at approximately $2 billion.

15.     Canyon Creek Development, Inc. ("CCD") is an Oregon corporation formed in 2001 with a principal place of business in Salem, Oregon. The principals of CCD include Harder and Relief Defendant Darryl E. Fisher. CCD was the sponsor of each TIC offering to investors. CCD personnel were responsible for locating, researching and negotiating the acquisition of property for Sunwest to manage, and they gathered information used to create the private placement memoranda distributed to investors with each offering.

16.     At all relevant times, Canyon Creek Financial, LLC ("CCF") was an Oregon limited liability company formed in 2005 with a principal place of business in Salem, Oregon. CCF is a captive broker-dealer — *i.e.*, its only products were the securities created by CCD — registered with the Commission and the Financial Industry Regulatory Authority ("FINRA"). CCF is wholly owned by Defendant Harder. CCF marketed and sold the securities sponsored by CCD through registered representatives and selling agreements with third-party broker-dealers.

## **RELIEF DEFENDANTS**

17.     Darryl E. Fisher ("Fisher"), age 45, resides in Salem, Oregon and has served as Sunwest's Chief Operating Officer ("COO") since 2000. In role as COO, he is responsible for the day-to-day operations of the retirement facilities managed by Sunwest. Fisher is the largest minority shareholder in Sunwest and CCD. He also holds minority interests in most of the LLCs that own the underlying retirement facilities. Fisher received financial distributions to which he was not entitled. Distributions were made to Fisher without regard to whether or not any property in which Fisher had an ownership interest was sufficiently profitable or otherwise financially able to make such a distribution. Fisher is named as a relief defendant in this action for the purpose of assuring complete relief.

18.     J. Wallace Gutzler ("Gutzler"), age 80, resides in Salem, Oregon and has served as Sunwest's General Counsel since 2000. He is a member of the Oregon State Bar. Gutzler is the second largest minority shareholder of Sunwest and holds minority interest in many of the LLCs that own the underlying retirement facilities. Gutzler received financial distributions to which he was not

entitled.  Distributions were made to Gutzler without regard to whether or not any property in which Gutzler had an ownership interest was sufficiently profitable or otherwise financially able to make such a distribution.  Gutzler is named as a relief defendant in this action for the purpose of assuring complete relief.

19.    Kristin Harder ("Mrs. Harder") is Harder's wife.  Mrs. Harder provided personal guarantees on most of the retirement facilities' mortgage loans.  She joined Sunwest as an employee in August, 2008 as a manager of a group of homes.  Mrs. Harder asked for and received on an *ad hoc* and frequent basis distributions of funds, which were withdrawn from Sunwest related accounts, without regard to any determination that any property or business in which she or Harder had an ownership interest was sufficiently profitable or otherwise financially able to make such a distribution.  Mrs. Harder is named as a relief defendant in this action for the purpose of assuring complete relief.

20.    Encore Indemnity Management LLC ("Encore") is a Nevada limited liability company formed in 2004 with a principal place of business in Salem, Oregon.  Harder and Fisher are Encore's majority owners.  Encore owns Encore Indemnity Ltd., a Cayman Islands company that provides workers compensation and automobile insurance to Sunwest-affiliated entities.  Encore received transfers of funds to which it was not entitled.  These transfers were made to Encore without regard to whether or not they were payments related to actual services rendered by Encore to a particular property or business.  Encore is named as a relief defendant in this action for the purpose of assuring complete relief.

21.    Senenet Leasing Company ("Senenet") is an Oregon corporation formed in 2002 with a principal place of business in Salem, Oregon.  Senenet is an employee leasing company that was formed to provide leased employees to Sunwest, CCD and other Sunwest-affiliated entities. Nearly all people who work for Sunwest are actually Senenet employees.  Defendants Harder and Fisher are principals of Senenet.  Senenet received transfers of funds to which it was not entitled.  These transfers were made to Senenet without regard to whether or not they were payments related to actual services rendered by Senenet to a particular property or business.  Senenet is named as a relief defendant in this action for the purpose of assuring complete relief.

22.     Fuse Advertising, Inc. ("Fuse") is an Oregon corporation formed in 2000 with a principal place of business in Salem, Oregon.  Defendant Harder is its majority owner.  Fuse provides marketing services to senior living facilities managed by Sunwest.  Fuse received transfers of funds to which it was not entitled.  These transfers were made to Fuse without regard to whether or not they were payments related to actual services rendered by Fuse to a particular property or business.  Fuse is named as a relief defendant in this action for the purpose of assuring complete relief.

23.     KDA Construction, Inc. ("KDA") is an Oregon corporation formed in 1999 with a principal place of business in Salem, Oregon.  KDA is a construction company whose principals include Defendant Harder.  KDA provided repairs and improvements to existing Sunwest managed properties, and also constructed assisted living facilities on land purchased by Sunwest affiliated entities.  KDA received transfers of funds to which it was not entitled.  These transfers were made to KDA without regard to whether or not they were payments related to actual services rendered by KDA to a particular property or business.  KDA is named as a relief defendant in this action for the purpose of assuring complete relief.

24.     Clyde Hamstreet ("Hamstreet") is a principal at Relief Defendant Clyde A. Hamstreet & Associates and has been installed as the Chief Restructuring Officer ("CRO") of Sunwest and its affiliated entities by Harder, Fisher, and Gutzler since November 22, 2008.  All Sunwest assets and assets of Sunwest affiliated entities that are owned by Harder, Fisher and Gutzler have been assigned to Hamstreet.  Hamstreet is named as a relief defendant in this action for the purpose of assuring complete relief.

25.     Hamstreet & Associates ("H&A") is an Oregon limited liability company formed in 2004 with a principal place of business in Portland, Oregon.  H&A is a business and turnaround consulting firm owned by Hamstreet.  H&A entered into a CRO Agreement with Harder, Fisher, Gutzler and Sunwest for Hamstreet and H&A to provide restructuring and management services to Sunwest and its principals.  Consequently, H&A may possess assets or property to which it is not entitled.  H&A is named as a relief defendant in this action solely for the purpose of assuring complete relief.

## FACTUAL ALLEGATIONS

**I.    Defendants Sold the TIC Securities.**

26.    From around 2001 through 2008, Sunwest raised more than $430 million from investors.  Sunwest raised most of these funds, approximately $300 million, from approximately 2006 through 2008, through 99 offerings in over one hundred retirement homes.

27.    Defendants' securities offerings to investors had virtually identical structures.  For each TIC investment sold, Harder and Defendant CCD, which was the sponsor of each offering, first identified a property to be acquired and managed by Sunwest.  Typically, the Defendants targeted facilities that were underperforming, which Defendants believed Sunwest could improve.  Certain of the properties were parcels of land on which Sunwest-affiliated companies constructed a retirement facility, which, once built, Sunwest managed.

28.    Once the property to be acquired was identified, CCD formed an Oregon limited liability company ("LLC") to act as the "Co-Owner" of the property to be acquired.  The Co-Owner typically offered a majority ownership in the property to investors through the TIC ownership interests.

29.    Harder was the majority owner of each such Co-Owner LLC.  In addition, for certain offerings, Harder, based on his sole discretion, gave minority interests in the LLC to Relief Defendants Fisher and Gutzler, or to other Sunwest employees.

30.    CCF, the captive broker-dealer, which was wholly owned by Harder, then worked with CCD to sell the TIC interest through private placements of the securities.  CCF offered and sold the TICs either directly to investors or through arrangements with other brokers.  Each TIC required a minimum investment, typically $100,000.  CCF (or other third party brokers) received brokerage commissions for their role in the offerings, while CCD received an "acquisition fee" for locating the property, which together amounted to millions of dollars from the offerings.  The commissions and acquisition fees, as well as other costs related to the offerings, consumed almost 10 percent of the funds raised from investors in each offering.

31.     The remaining investor funds obtained through the offerings were first used as the down payment for the identified retirement facility.  Sunwest financed the remaining purchase price for the properties through mortgage loans arranged by CCD with the Co-Owner as the borrower.  The mortgages for the facilities came from large financing institutions and local banks.  Sunwest-managed facilities are currently encumbered with debt, according to Harder's estimate, totaling approximately $1.8 billion.

32.     Once the property was purchased, the Co-Owner and TIC owners leased it to another Harder majority owned entity, an Oregon limited liability company known as the "Operator" and/or "Master Tenant."  The Master Tenant then hired Sunwest to manage the property for a fee equivalent to 7 percent of the gross revenue generated from the property.  Under the management agreements with Sunwest, Sunwest was given control of the properties' operations, including complete control over their finances.  The TIC investors had no role in operating or managing the property.

33.     Defendants offered and marketed the TIC interests through private placement memoranda ("PPMs"), which touted the investment opportunity in various ways.  First, the PPMs stated that the investments would pay a 10 percent return annually, in the form of "rent" due on the lease to the Master Tenant.  Although the PPM discloses that a property might fail to generate sufficient income, it made clear that, to the extent paid, the "rent" paid to an investor would be funded from the positive cash flow generated by the individual retirement home in which the investor held a TIC interest.

34.     Second, in the marketing information provided to investors, Harder, CCD and CCF touted Sunwest's expertise and ability to use economies of scale to lower costs and improve a facility's profitability.  Once the facilities improved their occupancy rate, the facility would be refinanced and Sunwest would buy out the investors' interests (returning their original investment) and pay them an additional 2 percent appreciation of the equity invested for each year the investor had held the TIC interest.

35.     Third, the loans securing the property were backed by the personal guarantees of Harder and Fisher, giving the false impression that the investments were safe.  The Defendants created this impression by representing to investors that Harder was worth $300 million.  Defendants

failed to disclose, however, that Harder's purported net worth consisted almost entirely of his ownership interest in Sunwest related entities, which Harder valued himself without the assistance of an independent appraiser.

## II. Defendants Raised Funds Through Fraudulent Misrepresentations and Omissions.

### A. The PPMs Falsely Described Investments as Dependent on the Success of the Individual Property.

36.     Although the PPMs changed over time, they all included similar language concerning how investor returns, in the form of "rent," would be paid.  Importantly, the PPMs cautioned and emphasized that the payment of returns on the TIC investments was dependent on the financial performance of the specific facility.

37.     For example, one CCD-sponsored PPM stated that "[t]he Master Tenants must be economically successful in order to pay your rent," and that "[t]he Master Tenant has limited assets and therefore may be unable to pay its rent obligations if the Property does not generate new resident deposits and operating income as projected."

38.     Another PPM sponsored by CCD stated that "[i]f the Master Tenant does not increase occupancy and generate positive cash flow prior to the exhaustion of its operating reserves, the Master Tenant may be unable to pay its debts, including its debt obligations and its obligations to pay your rent."  The same PPM further cautioned:  "Recent historical data for the Property shows lower occupancy and higher operating expenses than the Master Tenant has projected . . .  If actual operating results are below projected results, operating cash flow may not be sufficient to fund payments under the Master Lease."

39.     A third PPM sponsored by CCD stated that "the Master Tenants will operate the Properties for their own benefit and will be entitled to retain any positive difference between the net operating cash flow and rental payments due to, or for the benefit of, the tenants in common under the Master Lease. . .  Each Master Tenant is a newly-formed entity with no substantial assets other than its leasehold interest in the Property under the Master Lease . . .".

40.     Virtually all of the PPMs disseminated by CCF for offerings sponsored by CCD made either identical or substantially similar representations to statements made in the three CCD-

sponsored PPMs described above.  These statements represented to investors that the source of the Master Tenant's 10 percent rent payment was the cash generated by the facility.  While the Master Tenant's *obligation* to pay rent might continue regardless of the financial performance of the property, the PPMs represented that the Master Tenant's *ability* to make the rent payment was inextricably tied to the financial performance of the individual property.

41.    To emphasize this point, the PPMs included financial projections for how Sunwest expected the property to perform once under its management.  The PPMs did not include financial statements for Sunwest or other Sunwest-managed properties.

42.    From approximately 2001 through approximately July 2008, the Sunwest TICs did not miss a rent payment despite the fact that many Sunwest TICs were losing money.  Consequently, the payment to investors of the rent further conveyed to investors the false impression that Sunwest was managing their property profitably and successfully.

43.    At all times alleged herein, Defendants Harder, Sunwest, CCD and CCF knew or were reckless in not knowing that the PPMs represented that the Master Tenant's ability to make the rent payment was inextricably tied to the financial performance of the individual property.  Likewise, Defendants Harder, Sunwest, CCD and CCF knew or were reckless in not knowing that the PPMs included financial projections for how Sunwest expected the property to perform once under its management and that the PPMs did not include financial statements for Sunwest or other Sunwest-managed properties.

**B.    The PPMs Inaccurately Described the Role of Refinancing as it Related to the Investment and Omitted Material Information.**

44.    Investors were told in the PPMs that Sunwest had a history of improving the operations and profitability of retirement homes, and that the offerings targeted undervalued properties.  Sunwest stated its intention to turn around the property and improve occupancy, and anytime after 18 months following the closing, Sunwest expected to buy out the TIC investors' equity for a price equivalent to their original investment plus two percent return for each year the investment had been held.

45.     Harder and CCF representatives who sold the securities to investors generally explained that the repurchase of their shares would be accomplished through the refinancing of the property.  It was Sunwest's stated purpose to own the homes outright following this "buyout" of the TIC investors.

46.     Harder and CCF representatives failed to disclose to investors that in addition to "buying out" investors, proceeds from the refinancings were used to obtain cash from the equity in the property.  This cash in turn was used to fund the overall Sunwest enterprise.  Moreover, Sunwest, Harder and CCF representatives failed to disclose to investors that the use of these cash proceeds to fund the overall Sunwest enterprise was an integral component of Sunwest's business model.

47.     Defendants Harder and CCF knew or were reckless in not knowing that the PPMs inaccurately described the role of refinancing as it related to the investments and omitted material information about the use of proceeds obtained through refinancing.

**C.      Harder Made False and Misleading Disclosures to Investors.**

48.     Harder personally met with numerous investors at the investors' request, or at the request of CCF.  During these meetings Harder reinforced the misrepresentations in the PPMs and failed to disclose Sunwest's true business practices.

49.     For example, in at least one meeting with potential investors in around 2004, Harder told investors that each facility operated independently.  He assured investors that each facility observed reliable accounting practices implemented by two in-house accountants.  Harder further emphasized the independent nature of the investments by telling these investors that if they had concerns about their retirement home investment, they could diversify by purchasing interests in more homes so that if one did not perform, the others would still hold their value.

50.     At all times alleged herein, Harder knew or was reckless in not knowing that the representations that each facility operated independently were false.

**D.      Contrary to the Disclosures, Sunwest Operated its Business as a Unitary Enterprise.**

51.     Although investors were told that their returns came from profits generated by the individual home in which they purportedly invested, the truth was quite different.  In actuality,

investor returns came from at least three undisclosed sources.  First, the money generated by the homes' operations (and some of money raised from investors) was commingled.  Second, investor returns were dependent upon Sunwest's ability to refinance mortgage loans and use those proceeds to support its various operations, including payments to TIC investors.  Finally, Harder relied on loans from friends and associates to put additional cash into Sunwest as needed.

52.     Each of these practices was an integral part of the Sunwest business model.  However, by treating all affiliated entities as one giant enterprise, Sunwest was able to hide from investors the poor performance of many facilities.

53.     At all times alleged herein, Harder knew or was reckless in not knowing that profits paid to investors did not come from the profits of the home in which investors purportedly invested. Further, Harder knew or was reckless in not knowing that the money generated from operations were commingled, that investor returns were dependant on Sunwest's ability to refinance mortgage loans, and that Harder relied on loans from friends and associates to put additional cash into Sunwest as needed.

### E.    Sunwest Commingled All Proceeds from its Facilities.

54.     Sunwest, as the property manager of each TIC-funded home, had complete control over each home's finances.  Because many of the homes newly acquired by Sunwest had low occupancy, high costs, or other financial challenges, their cash needs exceeded what was generated by residents' payments to cover the expenses of the facility, service their debt, and make TIC rent payments.

55.     To deal with this problem, Sunwest's management practice from nearly the outset of its operations in the early 1990s was to borrow from facilities that had cash and loan it to facilities that needed cash.  Harder described this practice as "collective management" that treated the individual properties as "a single consolidated entity."

56.     Sunwest managed its cash on an "as available" basis, which meant that as various costs at the homes became due, whether it was large vendor bills, payroll, or debt service and TIC payments for particular properties, Sunwest's finance team simply found cash in whatever facility happened to have cash available at that moment and used that money to satisfy the obligation.

57.     To the extent the money was used for a purpose that was not related to the property from which the funds were taken, that property recorded the cash transfer as a "Note Receivable" on its balance sheet.  To the extent a property received funds (or the benefit of funds) from that transfer, that property recorded a "Note Payable" on its balance sheet.

58.     In order to facilitate transfers of cash between facilities, Sunwest established a business bank account at Wells Fargo Bank, in Harder's and Mrs. Harder's name.  In addition, Sunwest established an overdraft funding account at Wells Fargo.  Significant sums of money moved through these accounts.  The majority of the funds were transferred from one Sunwest retirement facility to another, via purported loans to and from Harder.

59.     Although the transfers of cash through the Harder business bank account were entered on the balance sheets for the various facilities as notes payable or notes receivable, the loans did not actually carry important terms, and there was no commercial substance behind them.  Thus, the loans were not separately documented and did not state a date upon which payment was due.  In short, the transfers in the form of supposed loans were simply the means by which Sunwest shifted cash among the facilities.

60.     In addition to cash from the operations of the various facilities, other money flowed into and out of the Harder business account.  In particular, on certain occasions, funds raised from investors were deposited into the Harder business account and were then used, as needed, to plug cash holes for other facilities.

61.     The Harder business account thus commingled funds from operations of the various facilities, and certain funds received from investors.  Those commingled funds were then used to pay expenses of the various facilities, including investors' returns in the form of a "rent" payment to the investors.

62.     As a consequence, funds from facilities that generated positive cash flow, and at times, funds from certain new investments, were used to pay the returns to investors of other retirement facilities.  Because the homes varied in profitability, on an enterprise-wide basis, successful homes were supporting unsuccessful ones.  As described further below, by failing to disclose the

commingling of funds, Defendants concealed the fact that a significant number of properties were unsuccessful and understated the risk of investing.

63.     At all times alleged herein, Harder knew or was reckless in not knowing that funds from facilities that generated positive cash flow, and certain funds from new investments, were used to pay the returns to investors of other retirement facilities.  Likewise, Harder knew or was reckless in not knowing that these facts were not disclosed to investors.

**F.    Sunwest Relied on Refinancings to Further Support Ongoing Operations**

64.     Although investors were told that Sunwest intended to refinance their homes in order to buy out the TIC interests, refinacing activity was actually critical to Sunwest's ability to fund its operations and make payments to investors.  Sunwest used cash generated from refinancing certain properties to support the ongoing operations of other properties, including to make rent payments to TIC investors.

65.     As a retirement facility achieved a 95 percent occupancy level, Sunwest typically arranged for new financing of that property at a lower interest rate.  After paying off the TIC investors in the refinanced facility, Sunwest used additional cash received in the refinancing as a source of funding for the greater Sunwest enterprise.

66.     However, investors were not informed that Sunwest's refinancing activity helped fund current operational costs of homes, and that, in some instances, the proceeds from refinancing homes were used to make the rent payments for other facilities.

67.     The implications of this undisclosed business model became evidence in late 2007, when the national credit crisis curtailed Sunwest's ability to refinance its homes.  As a consequence, this significant source of cash flow for Sunwest was seriously impacted, as was Sunwest's ability to meet all of its obligations to all of its homes.  However, investors were not told that their investments, supposedly in a particular retirement facility, exposed them to so much risk in the credit market.

68.     At all times alleged herein, Harder knew or was reckless in not knowing that Sunwest's refinancing activity helped fund current operational costs of homes, and that, in some instances, the proceeds from refinancing homes were used to make the rent payments for other

facilities.  Likewise, Harder knew or was reckless in not knowing that TIC investors were not told that their investments exposed them to certain risks in the credit market.

        **G.**      **Harder Relied on Promissory Notes Issued to Friends to Finance Sunwest.**

69.      Beyond the commingling of funds between facilities through supposed loans, and the use of refinancing proceeds to meet expenses, Harder routinely borrowed cash from friends and associates to meet the facilities' cash needs.  In return for the cash, the friends or associates received promissory notes from Harder.

70.      Harder used the proceeds from these notes to plug cash holes in Sunwest's operations, including the payment of returns to TIC investors.  Harder and the PPMS did not disclose to investors, however, that Harder was borrowing cash from friends and associates to meet cash needs of the Sunwest enterprise.  Harder knew or was reckless in not knowing that this information was not disclosed to investors.

        **H.**      **Sunwest Hid the True Performance of the Enterprise.**

71.      The Defendants used Sunwest's apparent success as an important means for marketing the TIC investments.  CCF sales persons boasted that Sunwest had never missed a payment and never lost a home.

72.      By operating Sunwest as a unitary enterprise, Defendants concealed from investors the true financial position of each facility.  Had Sunwest operated each property as the independent financial unit described to investors, the true picture of Sunwest's success at "turning around" properties as well as the success of each individual facility would have been visible to investors.  Instead, investors received the false impression that all Sunwest-managed facilities had become successful.

73.      The practical effect of the financial shell game that Sunwest played amongst its facilities was to create the illusion that purchasing a TIC investment in a Sunwest home was a safe, reliable investment with a long history of steady returns paid to investors.  By using funds from successful facilities and refinancing proceeds to pay TIC investors, Sunwest gave the false appearance that every property it managed was profitable enough to meet its expenses, pay its debt, and pay the TIC investors.

74.     In reality, according to Sunwest's own financial records, almost one-third of the retirement facilities were, in fact, cash negative for many years.  Many facilities had never been cash positive.  For instance, in the nine-month period ended September 30, 2007, 59 percent of the homes under Sunwest's management experienced negative cash flow.  And for the nine-month period ended September 30, 2008, 58 percent of the homes had negative cash flow.

75.     As a consequence, numerous investors received regular rent payments, purportedly from the proceeds of the facilities in which they invested, even though the facilities were losing money.  Under the terms of the PPM, those investors should not have received investment returns in the form of rent.  However, those TIC investors were lulled into believing that their investments were profitable because Sunwest had propped up the failing properties with money from other sources.

76.     Defendants did not have a reasonable basis to offer a 10 percent return to TIC investors.  Because Defendants' ability to pay consistent returns was contingent on the availability of cash from other properties and infusions of money from refinancings, and loans from Harder's friends, Defendants' representations that this rate of return could be sustained were misleading.

77.     Despite the negative cash flow of many retirement facilities and the PPM's disclosures to the contrary, every Sunwest managed facility continued to pay investors their 10 percent rent and did not cease payments until July 2008.

78.     The effect of this incredible track record was extremely powerful in recruiting money into the enterprise.  In 2004, Sunwest raised approximately $26 million from TIC investors.  In 2005, that amount more than doubled as Sunwest raised approximately $62 million from TIC investors, and in 2006 the amount nearly doubled again, as Sunwest raised approximately $122 million.

79.     In addition, Sunwest's apparently successful track record was also a means to convince existing investors to reinvest in Sunwest.  For example, after Sunwest "bought out" investors through refinancing, between approximately 80 and 90 percent of such investors rolled their investments into new Sunwest retirement facilities.  In addition, numerous investors also made multiple investments in Sunwest properties.

80.     At all times alleged herein, all Defendants knew or were reckless in not knowing that the true financial condition of Sunwest facilities was hidden from investors.  Likewise, they knew or

were reckless in not knowing that there was no reasonable basis to offer a 10 percent return (*i.e.*, "rent" payment) to TIC investors.  Finally, Defendants knew or were reckless in not knowing that by commingling funds to create the appearance of a successful track record, investors were mislead into believing that the Sunwest enterprise was much more successful and much less risky than it actually was.

**III.    The Sunwest Empire Collapsed, Leaving Investors With Huge Losses.**

**A.    The Credit Crisis Created a Cash Crunch For Sunwest.**

81.    By late 2007, the nationwide credit crisis rendered Sunwest's business model unworkable.  Sunwest's ability to refinance disappeared, and Sunwest confronted problems funding the operations of the various facilities.  As a result, Sunwest began defaulting on some mortgages and lenders began placing facilities into receivership or foreclosure.  Other lenders threatened to foreclose unless Sunwest put into place cash controls, such as lock boxes, to prevent transfers of cash between facilities.

82.    By December 2007, Sunwest was in risk of default on loans to its largest creditor, GE Healthcare Financial Services ("GE").  Other creditors also invoked penalty clauses that dramatically increased interest rates Sunwest was required to pay to obtain credit.

**B.    Sunwest Continued to Raise Money From Investors While on the Verge of Collapse.**

83.    While facing imminent collapse, Sunwest, CCD and CCF continued raising money from investors until in or around June 2008.  In fact, in early 2008 defendants conceived of an additional way to raise money by offering "preferred membership" interests in the Operator/Master Tenant limited liability company.  The money raised from new investments, between approximately January and June 2008, both TICs and preferred memberships, was used, in part, to fund struggling, pre-existing facilities rather than to finance the property described in the PPM.

84.    For example, in one offering that closed on around January 31, 2008, investors purchased membership interests in the limited liability company that was constructing a new retirement facility.  As was typical, CCF marketed this offering, CCD was the sponsor and Harder was the majority owner of the LLC that was the "Co-Owner" together with the TIC investors.  (Relief

Defendant Fisher was a minority owner of the LLC.)  Defendants raised approximately $1.5 million dollars from the TIC investors.

85.     However, contrary to the representations in the PPM that investor money would be used to complete ongoing construction on the property, at least approximately $400,000 of the investors' funds were immediately diverted to Harder, and recorded as a "loan" to him from the property.  Defendants did not disclose to the investors that the funds raised would be used to make an undocumented loan to Harder.

86.     In a further instance, CCD sponsored and CCF marketed the "Hawthorne Gardens Confidential Offering Memorandum," dated February 12, 2008, seeking to raise approximately $5 million to purchase a new facility for Sunwest to manage.

87.     Before the Hawthorne Gardens offering closed, on about May 30, 2008, Harder and other Sunwest and CCD employees met with persons from GE and were informed that GE intended to foreclose on its $590 million portfolio.  If Harder and Sunwest were unable to locate alternate financing to replace the GE financing, Sunwest's business would suffer tremendous economic harm.

88.     Harder, Sunwest, CCD and CCF took no steps to ensure that the Hawthorne Gardens investors were informed of this material information before the deal closed.  Instead, on about June 9, 2008, the Hawthorne Gardens offering closed, pouring approximately $5 million of new investor money into the enterprise.  Six months later, on about December 1, 2008, Hawthorne Gardens filed for bankruptcy.

89.     Harder, Sunwest, CCD and CCF knew or were reckless in not knowing that they failed to disclose Hawthorne Gardens' precarious financial situation.

90.     As the cash crisis at Sunwest grew, Sunwest stopped paying TIC investors and mortgage lenders on individual properties.  In around July 2008, for the first time, Sunwest missed payments to some TIC investors.  In around August and September 2008, the cascade continued as Sunwest was unable to make investor payments for nearly all its homes.

91.     From around October 2008 through around January 2009, approximately 25 receivers were appointed for individual facilities, approximately ten additional receivership hearings were

scheduled, approximately nine facilities had completed foreclosure or forced sales, and approximately 69 properties had pending foreclosure actions.

92.     During this same period, in an effort to stem further foreclosures and receiverships, Sunwest began placing the LLCs that own the individual facilities into bankruptcy.  To date, approximately 32 LLCs (representing approximately 32 facilities) have filed for bankruptcy protection under Chapter 11 of the Bankruptcy Code.

93.     On or around December 31, 2008, Harder filed for personal bankruptcy under Chapter 11 of the Bankruptcy Code.

94.     Despite Sunwest's dire financial situation, Harder took tens of millions of dollars out of the enterprise. For instance, between 2006 and 2008, Harder withdrew approximately $ 1.5 million from the Harder business account in which he commingled proceeds from all Sunwest facilities.

95.     During the time period alleged herein, all Relief Defendants Fisher and Gutzler received financial distributions to which they were not entitled.  Distributions were made to them without regard to whether or not any property in which they had an ownership interest was sufficiently profitable or otherwise financially able to make such a distribution.

96.     During the time period alleged herein, Relief Defendant Mrs. Harder asked for and received on an *ad hoc* and frequent basis distributions of funds, which were withdrawn from Sunwest related accounts, without regard to any determination that any property or business in which she or Harder had an ownership interest was sufficiently profitable or otherwise financially able to make such a distribution.

97.     During the time period alleged herein, Relief Defendants Encore, Senenet, Fuse and KDA received transfers from Sunwest related accounts without regard to whether or not they were payments related to actual services rendered by these Relied Defendants to a particular property or business.

98.      Relief Defendant Hamstreet was installed as the CRO of Sunwest and its affiliated entities by Harder, Fisher, and Gutzler.  All Sunwest assets and assets of Sunwest affiliated entities that are owned by Harder, Fisher and Gutzler have been assigned to Hamstreet.  Relief Defendant H&A entered into a CRO Agreement with Harder, Fisher, Gutzler and Sunwest for Hamstreet and

H&A to provide restructuring and management services to Sunwest and its principals.  Consequently, Hamstreet and H&A may possess assets or property to which it is not entitled.

## FIRST CLAIM FOR RELIEF

### (Violations of Section 17(a) of the Securities Act by All Defendants)

99.    The Commission realleges and incorporates by reference paragraphs 1 through 98.

100.    By engaging in the acts and conduct alleged above, Sunwest, CCD, CCF, and Harder, directly or indirectly, in the offer or sale of securities, by use of the means or instruments of transportation or communication in interstate commerce or by use of the mails: (a) with scienter employed devices, schemes, or artifices to defraud; (b) obtained money or property by means of untrue statements of material fact or by omitting to state a material fact necessary in order to make statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchasers.

101.    By reason of the foregoing, Sunwest, CCD, CCF, and Harder have violated and, unless restrained and enjoined, will continue to violate Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

## SECOND CLAIM FOR RELIEF

### (Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder by All Defendants)

102.    The Commission realleges and incorporates by reference Paragraphs 1 through 98.

103.    By engaging in the acts and conduct alleged above, Sunwest, CCD, CCF, and Harder, directly or indirectly, in connection with the purchase or sale of securities, by the use of means or instrumentalities of interstate commerce, or of the mails, or of a facility of a national security exchange, with scienter:  (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons, including purchasers and sellers of securities.

104.    By reason of the foregoing, Sunwest, CCD, CCF, and Harder have violated and, unless restrained and enjoined, will continue to violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. §§ 240.10b-5] thereunder.

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that the Court:

### I.

Enjoin defendants Sunwest, CCD, CCF, and Harder from directly or indirectly violating 17(a) of the Securities Act [15 U.S.C. § 77q(a)], Section 10(b) of the Exchange Act [15U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

### II.

Enter an order temporarily freezing the assets of defendants Sunwest, CCD, CCF, and Harder.

### III.

Enter an order temporarily freezing the assets of relief defendants Fisher, Gutzler, Mrs. Harder, Encore, Senenet, Fuse, KDA, Hamstreet, and H&A that are the proceeds received by these relief defendants related to the misconduct alleged herein.

### IV.

Appoint a receiver for Defendants Sunwest, CCD, CCF, and all entities they control or in which they have an ownership interest.

### V.

Appoint a receiver for all entities that Defendant Harder controls or in which he has an ownership interest.

### VI.

Enter an order enjoining new bankruptcy, foreclosures or receivership actions.

### VII.

Order Defendants Sunwest, CCD, CCF, and Harder to provide an accounting and to disgorge their ill-gotten gains in an amount according to proof, plus prejudgment interest thereon.

VIII.

Order Defendants Sunwest, CCD, CCF, and Harder to pay civil money penalties pursuant to Section 20(d)(1) of the Securities Act [15 U.S.C. § 77t(d)(1)] and Section 21A of the Exchange Act [15 U.S.C. § 78u-1].

IX.

Order Relief Defendants Fisher, Gutzler, Mrs. Harder, Encore, Senenet, Fuse, KDA, Hamstreet, and H&A to disgorge their ill-gotten gains with prejudgment interest in an amount according to proof, plus prejudgment interest thereon.

X.

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

XI.

Grant such other and further relief as this Court may deem just, equitable, and necessary.

Dated:  March 2, 2009                    Respectfully submitted:

By:  /s/ Mark P. Fickes_____
                    Mark P. Fickes

Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION