IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF OREGON

SECURITIES AND EXCHANGE COMMISSION,   )
                                      )
                Plaintiffs,           )    Civil No. 09-6056-HO
                                      )
                                      )
                v.                    )    FINDINGS OF FACT AND
                                      )    CONCLUSIONS OF LAW
                                      )
SUNWEST MANAGEMENT, INC., CANYON      )
CREEK DEVELOPMENT, INC., CANYON       )
CREEK FINANCIAL LLC, and JON M.       )
HARDER,                               )
                                      )
                Defendants,           )
                                      )
        and                           )
                                      )
DARRYL E. FISHER, J. WALLACE GUTZLER, )
KRISTIN HARDER, ENCORE INDEMNITY      )
MANAGEMENT LLC, SENENET LEASING       )
COMPANY, FUSE ADVERTISING, INC., KDA  )
CONSTRUCTION, INC., CLYDE HAMSTREET,  )
and CLYDE A. HAMSTREET & ASSOCIATES,  )
LLC,                                  )
                                      )
                Relief Defendants,    )
_____)

This matter comes before the court upon the motion to approve the Proposed Distribution Plan (Dkt. No. 537) (the "Plan") filed jointly by Michael Grassmueck, court-appointed Receiver (the "Receiver") and Clyde Hamstreet, Chief Restructuring Officer ("CRO") for Sunwest Management, Inc. ("SMI") and several hundred affiliates (as defined in the Plan, the "Sunwest Enterprise").[1]

At its peak, the Sunwest Enterprise controlled and/or operated hundreds of assisted living facilities around the country. The Sunwest Enterprise also controlled and managed other investments, including real property both related and unrelated to the assisted living facilities.  Over the past several years, hundreds of millions of dollars in new investments in the Sunwest Enterprise were solicited, primarily offered and structured as tenant in common ("TIC") real property investments, without disclosures to investors of material information about the Sunwest Enterprise.

This case involves the near financial meltdown of the Sunwest Enterprise.  Jon Harder, the founder of the Sunwest Enterprise, and dozens of Receivership Entities have filed voluntary chapter 11 proceedings.  The Sunwest Enterprise has critical cash flow problems arising from the over leveraging of properties, lower than industry standard occupancy, and disruption in the capital markets. This has caused the Sunwest Enterprise to be in severe financial distress for the past two years, and has led to hundreds of

---

[1]Capitalized terms not defined herein shall have the meaning set forth in the accompanying Proposed Distribution Plan.

millions of dollars in investment losses, primarily to individual investors who had intended to restrict their investments to specific facilities.

The Sunwest Enterprise, however, was managed as a unitary enterprise that generally did not respect the separateness of the Receivership Entities nor the restricted purposes of invested funds that were intended to be limited to use for specific facilities. Without the Distribution Plan, the investors have little hope that they will achieve the expected, or perhaps any, return on their investments.  Many investors would receive no recovery of their investment without the prompt implementation of a Distribution Plan.  The status quo is unsustainable and will cause further losses to all investors and creditors. There is neither an easy nor a perfect solution to the problems created by the historic operations of the Sunwest Enterprise. By approval of the Distribution Plan, as modified by this Court and reflected in the attached redline of the filed Distribution Plan, and as set forth in detail in the following findings of fact and conclusions of law, the Court attempts to ameliorate the harm to the innocent persons and entities who were unknowingly caught up in these events.

<u>PROCEDURAL HISTORY</u>

1. On March 2, 2009, the United States Securities and Exchange Commission (the "Commission") filed its Complaint against

Defendants Sunwest Management, Inc., Canyon Creek Development, Inc., Canyon Creek Financial, LLC, and Jon M. Harder, and Relief Defendants Darryl E. Fisher, J. Wallace Gutzler, Kristin Harder, Encore Indemnity Management, LLC, Senenet Leasing Company, Fuse Advertising, Inc., KDA Construction, Inc., Clyde Hamstreet, and Clyde A. Hamstreet & Associates, LLC, for violation of the federal securities laws, injunctions against future violations and recoveries of restitution and penalties for the violations. The Commission's Complaint alleges that the Sunwest Enterprise control parties operated the Sunwest Enterprise virtually as a "Ponzi" scheme.

2. On the same day, the Commission filed its application for a preliminary injunction and appointment of a receiver. On March 3, 2009, the Court entered a temporary restraining order. On March 10, the Court entered an order that provides for, among other things, the preliminary injunction and appointment of the Receiver (the "Receiver Order").

3. Pursuant to the Receiver Order, the CRO was granted certain authority including the continuing authority over the day-to-day operations of the Sunwest Enterprise and disposition of assets, subject to consultation with the Receiver. Moreover, the Court appointed a Management Committee comprised of two representative Tenant In Common Claimants and two representative Unsecured Creditor Claimants to act as a fiduciary committee for Receivership

Entities pursuant to the Receiver Order and that certain Order Approving Rights and Powers of CRO and Management Committee entered by the Court on June 12, 2009, as docket no. 352.

4. Since entering the original Receiver Order, the Court has entered additional Receiver Orders to include additional Receivership Entities that were affiliates of the original Receivership Entities and part of the Sunwest Enterprise that had not been specifically identified as of the date of the original Receiver Order (together with the original Receiver Order, the "Receiver Orders").

5. The Court has entered numerous orders allowing certain parties to intervene in the SEC Enforcement Action, for purposes of appearing in the Federal Receivership Case. Primarily, these parties are Secured Creditors of certain of the Receivership Entities.

6. The Court directed the Receiver and CRO to consult with parties in interest in connection with formulation of the Distribution Plan, including the Management Committee, the TIC Committee and the Unsecured Creditors' Committee formed in the Harder Bankruptcy, certain representative TIC Investors, Secured Creditors, Unsecured Creditors, and the HFG Parties. These consultations led to many Mediation sessions among the various parties in interest, resulting in numerous interim settlements or compromises with respect to the terms of the proposed Distribution

Plan. The Court has recorded a number of these settlements or compromises on the record, including on July 15 and August 6, 2009.

7. The Court established a schedule for the filing of the Plan and related pleadings and documents and the hearing on approval of the Distribution Plan and related proceedings.

8. Pursuant to the established schedule, the Receiver and CRO filed the proposed Distribution Plan on August 25, 2009. Also on that date, the Receiver and CRO filed their joint motion for approval of the Distribution Plan and notice of the approval hearing (Dkt. No. 541, the "Hearing Notice") as well as detailed declarations by the CRO. Alvarez and Marsal advisors Matt Marcos and Paul Rundell, the Receiver, and his forensic accountant Greg Gadawaske of Financial Forensics.

9. The Hearing Notice set forth the deadline to file any response to the Distribution Plan as September 9, 2009.

10. Numerous parties, including Certain Coordinating Lenders, filed objections or other responses to the request for approval of the Distribution Plan. On September 18, 2009, the Receiver and CRO filed their Omnibus Reply to Objections to Distribution Plan Proposed By Receiver And Chief Restructuring Officer (the "Omnibus Reply"). A summary of all the timely-filed objections to the Distribution Plan is attached to the Omnibus Reply as Exhibit 1.

11. Several parties filed and served additional objections and declarations after the Omnibus Reply was filed, including Certain

Coordinating Lenders who filed a supplement to their original objection and several declarations on the eve of the hearing on the Distribution Plan.

12. The hearing on approval of the Distribution Plan was conducted on September 23, 2009 (the "Approval Hearing"), at which time the court heard testimony, arguments and reviewed documentary evidence in connection with the Distribution Plan. All parties were afforded an opportunity to make an appearance, present evidence, cross-examine the witnesses offered in support of approval of the Distribution Plan, and make arguments in connection with the Court's consideration of approval of the Distribution Plan. Appearances were made as reflected in the Court's record.

13. The Court has considered the Distribution Plan, the circumstances leading up to the commencement of the Federal Receivership Case, the reports the Court has received about the operations of the Sunwest Enterprise during the Federal Receivership Case, the numerous requests for relief filed by many Secured Lenders, investors and others affected by the Federal Receivership Case, the pleadings and documents filed in support of and objection to the approval of the Distribution Plan; the sworn testimony of the declarants and witnesses; the statements, arguments, and representations of counsel made at the Approval Hearing; and the complete record in this Federal Receivership Case

and related Harder Bankruptcy and other bankruptcy proceedings. Based on the foregoing, the Court finds and concludes as follows:

FINDINGS OF FACT

1. The Hearing Notice advised interested persons of the date, time, and place of the hearing on approval of the Distribution Plan and the Claims Process and their right to attend. (Hearing Notice, Dkt. No. 541). In addition, the Hearing Notice informed interested parties of their right to object and comment on proposed Distribution Plan and provided mailing and email addresses to submit objections and comments to the court, the Receiver, and the CRO. (Id.)

2. Approximately 81,000 Hearing Notices were mailed to potential Claimants. [Dkt. No. 597.] Copies of the Hearing Notice and Distribution Plan were also posted on the web sites of the Receiver. (Id.)

3. The Distribution Plan describes terms that have been agreed to through Mediation among the Receiver and CRO, and the HFG Parties (the "HFG Settlement"). For purposes of the HFG Settlement and the Distribution Plan, the Court has determined that the HFG Settlement will be resolved prior to or in connection with the Reorganization Plan, as set forth in the attached redline of the Distribution Plan.

4. The Court has been asked to approve the Distribution Plan and to make certain findings in connection with the approval of the Distribution Plan.  Some of these findings are necessary to the approval and implementation of the Distribution Plan, and some were agreed upon conditions to support the Distribution Plan made in connection with the Distribution Plan mediation settlements that were placed on the record as the Distribution Plan was being negotiated among the various major stakeholders with the assistance of the Court and the Court appointed Mediator. In particular, as discussed in more detail below, certain findings are helpful to Tenant In Common ("TIC") and other investors who have suffered losses of their investments and face the serious additional risk of adverse tax consequences.  In determining whether to make the requested findings, the Court is mindful of the unusual and somewhat unique circumstances of this case, especially with respect to the tax issues and how it may affect investors and creditors as well as the Defendants  and Relief Defendants identified in the SEC Enforcement Action.

5. The SEC filed a complaint which contends that the Defendants, who in large part controlled the Receivership Entities pre-receivership, engaged in a massive fraud that led to losses of hundreds of millions of dollars to investors who acquired TIC interests in the real properties and to other investors and creditors as well.  The SEC further contends that TIC investors and

other investors were told that they were purchasing ownership interests for a specific real property that would generate enough profit to pay a fixed promised annual return, and that Sunwest had a history of never missing a payment. These representations, according to the SEC, were false and concealed the true nature of the investments and the risk to investors from Sunwest's precarious financial position.

6. The SEC further contends that, contrary to representations by Defendants that investors were obtaining an interest in a specific real property which would generate a steady income stream, Defendants ran Sunwest as an integrated unitary enterprise, commingling investor and creditor funds and operational revenue into essentially a single fund, often funneled through the personal bank account of Harder, from which operating expenses and investor returns were paid. Furthermore, the SEC contends that, contrary to Defendants' representations, including written representations and marketing pitches, Sunwest paid some investors and some creditors steady returns on their investments and claims, not from successful management of a particular real property asset, but from cash generated in the operations of other real property assets and from funds obtained by refinancings, from loans from Defendant Harder and certain Harder creditors, and from funds raised through offerings to new investors. The SEC contends that these facts were

not disclosed to, or known by, investors and constituted securities fraud.

7. According to the SEC, by June 2008, the Defendants operated Sunwest virtually as a Ponzi scheme: money raised in the final offerings (represented to be for new real property assets) was used to pay old investors and creditors their promised return and payments and otherwise fund existing operations and other real property assets. The SEC accuses Defendants or Harder of reporting income to investors and creditors that was partially or wholly fictitious. The SEC also contends that, despite Sunwest's dire financial situation, Defendant Harder misappropriated tens of millions of dollars, and the Relief Defendants were the recipients of substantial ill gotten gains. The SEC contends that as a result of this conduct, as of January 2009, over 100 real properties operated by Sunwest were in jeopardy of foreclosure, and in or headed into Rents and Profits Receiverships or bankruptcy cases.

8. These are serious accusations by the SEC, and according to the SEC, are based on a thorough investigation of Sunwest records and depositions and interviews of various Sunwest insiders, including Defendant Harder, and of investors and others.

9. In response to the filed complaint and allegations of the SEC, the dire financial circumstances facing many of the Receivership Entities, the continuing losses being experienced and threatened to the detriment of investors and creditors, and the

support of Defendants, Relief Defendants and Case Fiduciaries, the Court issued an Order Granting Preliminary Injunction and Appointing Receiver ("Order") with respect to numerous entities affiliated with Sunwest. That Order created the Receivership Estate consisting of assets protected by the injunction and under the control of the Receivership Entities, all as described in the Order.

10. As part of that Order, the Receiver was specifically charged with the investigation of the financial condition of the Receivership Entities, the disposition of investor funds, and the extent of commingling of funds among Defendants, Relief Defendants and Receivership Entities and the impact of any commingling on the losses and claims of investors and creditors.

11. The Receiver retained attorneys and accountants to assist with his duties and on April 24, 2009, filed his First Interim Report. The views and opinions of the Receiver and his accountants, as set forth in the First Interim Report, and in the Declarations of the Receiver and his accountants and the CRO filed in support of approval of the Distribution Plan, have been considered and utilized by the Court in connection with the Court's issuance of the Order Approving Distribution Plan and these additional findings. The Receiver and his accountants conducted an independent review of certain books and records of Sunwest, interviewed numerous Sunwest employees and managers and others, and

concluded that there is substantial evidence to support a conclusion that investor and creditor funds were utilized for purposes that were not disclosed prior to the investments and for purposes inconsistent with the expectations and documents related to the investments.  The CRO and the Receiver have concluded that in order to treat the investors and creditors fairly, as well as to serve the public purpose of establishing an orderly mechanism to administer the assets of the Receivership Estate and implement an equitable mechanism to reduce the losses experienced by investors and creditors, the Distribution Plan needs to be premised on the Court recognizing that the use of funds by the Sunwest Enterprise was on a unitary enterprise basis, without regard to separate purposes or restrictions, and that it would be inequitable to treat the claims of investors and creditors in any manner other than on a parri passu, pro rata equitable claim calculation basis (modified Money-In less Money-Out) as proposed in the Distribution Plan.

12. The HFG Parties and certain Secured Lenders vigorously deny the contentions of the SEC and dispute many of the conclusions of the Receiver, CRO and other declarants in support of the Distribution Plan.  The HFG Parties and certain Secured Lenders acknowledge that funds were often transferred from one Receivership Entity to another, sometimes in contravention of agreements or without the knowledge or consent of creditors and investors. However the HFG Parties and certain Secured Lenders contend that

there was no commingling per se because records were kept, and that all transfers were faithfully recorded.

13. The Court is informed that for purposes of settlement with the Commission, Harder will not dispute that on certain occasions when Harder met personally with a potential investor, he encouraged the investor to purchase a TIC interest in a particular facility, and during such conversations, Harder, at times, made representations to potential investors which led them to believe that the potential TIC investment was limited to only the risks and benefits of an investment in only that particular facility. Furthermore, Harder will not dispute that at times, Harder directed money transfers to be made from cash flow positive Sunwest facilities to negative cash flow Sunwest facilities and from negative cash flow Sunwest facilities to cash flow positive Sunwest facilities to ensure the facilities could meet financial obligations to residents, investors, and creditors. And, Harder will not dispute that in conversations with some potential investors, Harder at times omitted material facts necessary to avoid misleading these potential investors into believing that their investment was limited to only that particular facility, and that as a result of the money transfers between facilities, the TIC investments were not always limited to a particular facility, and were at times intertwined with other facilities also managed by Sunwest.

14. After review of all the facts and circumstances currently known to the Court, the Court finds as follows. First, the Court already determined that there was enough probability of success by the SEC on its complaint for the Court to issue a Preliminary Injunction and appoint the Receiver.  Second, the independent Receiver charged with investigating these matters as the Court's agent has reached a conclusion that there was extensive and wrongful commingling of funds, both from successful Receivership Entities to less successful Receivership Entities, and from Receivership Entities that were in serious financial distress to solvent and successful Receivership Entities, and that a variety of descriptions for transfers into and out of Receivership entity accounts and into and out of Defendant Harder's account exist in the Sunwest records .  The Receiver has concluded that by mid to late 2008, funds were being utilized and paid on almost a pure "availability" and "cash flow needs basis" and without regard to the source or intended or required use of the funds, and without the knowledge or consent of affected investors and creditors. The Receiver has further concluded that the pervasive nature of the commingling has rendered it virtually impossible to trace the ultimate source and use of the funds.  In other words, on at least some occasions, new investor funds intended for one facility were used instead to make lease, interest, or other payments to old investors in unrelated facilities.

15. The Court has considered all the evidence presented to it and has determined for purposes of approving the Distribution Plan, and not for any other purpose, that there is substantial evidence of the Sunwest Enterprise procuring and using funds in a commingled manner without the prior knowledge or consent of investors and creditors, and in a manner inconsistent with the representations to investors and creditors. That commingling, coupled with the inability to trace funds, the evidence of recordation of descriptions that were inconsistent, changed after the fact, and/or inaccurate, and the evidence that the Sunwest Enterprise decided how and where to use funds on a "who-needs-the cash now" basis warrants the finding of unitary enterprise, and claim calculation method and claim distribution treatment set forth in the Distribution Plan. In Fact, the evidence is overwhelming that the Sunwest Enterprise has been conducted as a unitary enterprise. The Court believes that, subject to the specific exceptions in the Distribution Plan, it would be inequitable for an investor or creditor to have its claim allowed or receive a distribution based on the existing value of any specific facility given the evidence that funds were taken from one property for use on another regardless of whether the funding property had positive or negative cash flow or value.

16. The Court reviewed the eve-of-hearing supplemental objection filed by Certain Coordinating Lenders and the

declarations filed in support thereof, heard cross-examination of the witnesses submitting such declarations, including testimony of Mr. McFarlane and Professor Rasmussen, offered as expert testimony. The declarations and testimony in court of the witnesses proffered by Certain Coordinating Lenders do not credibly refute the evidence presented throughout this case by the SEC, the Receiver, and the CRO, and the evidence specifically presented in connection with the Approval Hearing, that misrepresentations were made to investors concerning the use of invested funds, that invested funds were commingled among the Receivership Entities, the Defendants, and the Relief Defendants, and that certain investment proceeds were used to make distributions to prior investors.

17. The Court is encouraged by the TIC investors to make a finding that the use of funds in the manner described above caused the TIC investors to be denied the rights, privileges and benefits that would otherwise inure to them as holders of real property interests. That finding is necessary to potentially make applicable Internal Revenue Coder § 1033, which provision may be necessary to insulate TIC investors from adverse tax consequences in addition to the investment losses they have suffered, and is a mediation condition for the support of the Distribution Plan by the TIC Committee. The Court agrees and hereby finds that the control and use of cash inconsistent with the legal restrictions and separateness that were contained in the TIC documents did deprive

the TIC investors of the benefits of real property ownership to which they were entitled.

18. The Court concludes that the evidence of commingling is sufficient, the commingling so extensive and pervasive, and the impact of the commingling on the amount owed to investors and creditors so significant that, in order to make an equitable distribution to investors and creditors, as well as to serve the public purpose of establishing an orderly mechanism to administer the assets of the Receivership Estate and implement an equitable mechanism to reduce the losses experienced by investors and creditors, the Receivership Entities are to be considered a unitary enterprise for the purposes set forth in the Distribution Plan, and that a single chapter 11 filing to reorganize the unitary Sunwest enterprise is warranted and appropriate.

19. The Court also recognizes that its decision to approve the Distribution Plan and, thus, to treat the Receivership Entities as a unitary enterprise and to authorize the commencement of a single chapter 11 filing to reorganize that unitary Sunwest enterprise will effect a nonvoluntary taking on the Effective Date of the Reorganization Plan of the real property interests of TIC investors, and the Court determines that such taking is for the public purposes of (I) ensuring the orderly and equitable administration of the Receivership Estate in furtherance of the public purpose underlying the appointment of the Receiver at the

behest of the SEC, and (ii) assisting the SEC to protect the investing public redress the wrongs causing the investing public to suffer losses, and therefore, the takings are to be recognized as being for a public purpose.

20. To the extent that any of the foregoing Findings of Fact could also be characterized as Conclusions of Law, they are also deemed to be Conclusions of Law.

<u>CONCLUSIONS OF LAW</u>

1. The Hearing Notice sufficiently complied with the statutory requirements of Section 3 of the Securities Act of 1933, as amended, 15 U.S.C. § 77c(a)(10). Notice provided was sufficient under the facts and circumstances of this case.

2. A district court administering an equity receivership has the power to fashion any distribution plan that is fair and equitable. <u>SEC v. Hardy</u>, 803 F.2d 1034, 1037 (9th Cir. 1986); <u>SEC v. Wang</u>, 944 F.2d 80, 84-85 (2d Cir. 1991); <u>see also</u> <u>SEC v. Basic Energy & Affiliated Res., Inc.</u>, 273 F.3d 657, 670-71 (6th Cir. 2001); <u>SEC v. Forex Asset Mgmt. LLC</u>, 242 F.3d 325, 331 (5th Cir. 2001); <u>SEC v. Elliott</u>, 953 F.2d 1560, 1566 (11th Cir. 1992). There are no set rules
or specific plan terms or means of implementation that govern distribution plans in federal equity receiverships. <u>SEC v. Byers</u> 2009 WL 2185491, 6 (S.D.N.Y. 2009).

3. Federal equity receivership courts are not required to exercise bankruptcy powers and nor to strictly apply bankruptcy law. <u>CFTC v. Eustace</u>, 2008 WL 471574, at *6 (E.D. Pa. 2008) (citing <u>CFTC v. Topworth Int'l, Ltd.</u>, 205 F.3d 1107 (9th Cir.1999); <u>Forex Asset Management</u>, 242 F.3d 325; <u>Elliot</u>, 953 F.2d 1560). The Court finds no support for the objecting parties' assertion that this Court must follow the priority scheme applied in bankruptcy cases or that equity requires that unsecured claims be favored over the claims of victimized investors in this case. On the other hand, federal equity receivership case law supports an equitable, pro rata distribution as provided for in the Distribution Plan. <u>See, e.g.</u>, <u>Byers</u>, 2009 WL 2185491 (summarizing case law).

4. In approving a plan of distribution in an SEC receivership case, the court must determine the most equitable distribution result for all claimants, including investors. Typically, tracing of invested funds does not yield the most equitable result, because the ability to trace funds is the result of the merely fortuitous fact that certain investor funds were spent before funds of others, where the funds of investors have been shown to be substantially commingled. <u>See, e.g.</u>, <u>United States v. Durham</u>, 86 F.3d 70 (5th Cir. 1996); <u>Forex Asset Mgmt.</u>, 242 F.3d at 331. The extent of commingling necessary to justify abandoning a tracing approach is not settled in the applicable case law. Due to the fungibility of money, however, courts have held that any commingling is enough to

warrant treating all the funds as tainted. <u>Byers</u>, at *15 (citing <u>United States v. Garcia</u>, 37 F.3d 1359, 1365-66 (9th Cir. 1994); <u>SEC v. Better Life Club of Am.</u>, Inc., 995 F.Supp. 167, 181 (D.D.C.1998); <u>SEC v. Lauer</u>, 2009 U.S. Dist. LEXIS 23510, at *4 (S.D.Fla. Mar. 25, 2009)). Commingling need not necessarily be systematic to justify alternatives to tracing investor funds. <u>CFTC v. Eustace</u>, 2008 WL 471574, at *7 (E.D. Pa. 2008).

5. Due to the extensive commingling of funds among the Receivership Entities and the HFG Parties, if all Investors' funds are administered separately, a significant number of Investors who have invested in certain Receivership Entities or related properties or facilities would receive no return on their investment, while others who were fortunate enough to have invested in certain Receivership Entities or related properties or facilities may receive all of their invested capital plus interest. The Court finds and concludes that this result would be inequitable because it would allow greater recovery by certain Investors on the arbitrary basis of the actions of the Sunwest Enterprise control parties. <u>Durham</u>, 86 F.3d at 72.

6. Moreover, favoring certain Investors through tracing invested funds is not justified solely because such investments were "legitimate" transactions that otherwise would be recognized and enforced according to their terms by the courts. Because the Sunwest Enterprise relied on commingling funds to support its

operations, all of its transactions lost this presumption of legitimacy. It may seem only fair that an Investor who can trace and recover his invested funds should be able to do so. That would be true as between the Investor and the HFG Parties or the Sunwest Enterprise. But it is not true as among that Investor and either the creditors of or other Investors in the Sunwest Enterprise. As a matter of equity, one Investor should not be permitted to benefit from a fraud at the expense of other Investors merely because he was not himself to blame for the fraud. Scholes v. Lehmann, 56 F.3d 750, 757 (7th Cir. 1995).

7. Additionally, due to the large number of transactions used to commingle the funds, tracing all funds transferred would be extremely difficult, time consuming and costly to the Receivership Estate. Even if such tracing were performed, most if not all of the funds transferred have already been paid out and are no longer available.

8. A substantial body of case law concerning distributions through federal equity receiverships supports equitable pooling of the assets of receivership entities in order to enable pro rata distributions to investors in cases like this one. Eustace, 2008 WL 471574, at *6 (citing CFTC v. Topworth Int'l, Ltd., 205 F.3d 1107 (9th Cir.1999); Forex Asset Management, 242 F.3d 325; Elliot, 953 F.2d 1560. The Court is not bound in this Federal Receivership Case to apply the bankruptcy law concept of substantive

consolidation or to follow bankruptcy case law regarding that separate and distinct concept. _Id_.

9. The court has been adequately advised of the terms and conditions of the Distribution Plan and has reviewed it, along with all the declarations and exhibits submitted, the evidence submitted at the hearing, and comments from interested parties made both before and at the evidentiary hearings.

10. The Distribution Plan has been proposed in good faith and not by any means forbidden by law.

11. The court has carefully considered the Distribution Plan and concludes that it represents the most equitable distribution of the value of the Receivership Estate to Claimants. The Distribution Plan presents adequate means for the realization of the highest and best value of the Sunwest Enterprise for the benefit of all stakeholders, including through the recognition of the unitary enterprise and its reorganization through the Reorganization Plan. The Distribution Plan through its treatment of various Claimants, best balances the difficulties resulting from the commingling of funds and the harm caused to Investors with the interests of creditors, the Receivership Entities, and the HFG Parties who wish to satisfy their obligations to their Investors. The terms and conditions of the Distribution Plan do not discriminate unfairly against any class of Claimants and are fair and equitable in the best interest of all interested parties.

Accordingly, the Distribution Plan shall be approved.  The final approved form of the Distribution Plan shall be attached to the court's order approving the Distribution Plan (the "Approved Plan").

12. The utilization of Summary Procedures, as referenced in and for the purposes set forth in the Approved Plan, are appropriate. In implementing a plan of distribution, the court's use of summary proceedings to allow, disallow, and subordinate claims has been approved as an appropriate and efficient adjudication mechanism, so long as potential claimants are afforded an opportunity to be heard and present claims. SEC v. Elliott, 953 F.2d 1560, 1567 (11th Cir. 1992); McFarland v. Winnebago South, Inc., 863 F. Supp. 1025, 1034 (W.D. Mo. 1994); FDIC v. Bernstein, 786 F. Supp. 170, 177 (E.D.N.Y. Jan. 10, 1992); 13 Moore's Federal Practice (3d ed.) § 66.06[4][b]. Indeed, the use of these summary procedures promotes judicial efficiency and reduces litigation costs to the receivership, thereby preserving receivership assets for the benefit of all claimants. Bernstein, 786 F. Supp. at 177.

13. The court authorizes and directs the Receiver and the CRO, respectively as set forth in the Approved Plan, to take all actions necessary and appropriate to put the Approved Plan into effect.

14. In particular, but without limitation, the Receiver and the CRO are authorized to reorganize the unitary enterprise recognized by the Approved Plan through the pending chapter 11 case

of In re Stayton SW Assisted Living, LLC, Bankruptcy Case No. 08-36637 pending before this court, as set forth in the Approved Plan.

15. The Receiver and CRO have retained necessary and appropriate professionals to assist them in implementing the Approved Plan, and are authorized without further Court order to continue their employment from and after entry of the court's order approving the Approved Plan. Compensation of such professionals shall remain subject to court approval.

16. The Receiver and CRO shall have the ultimate authority in implementing the Approved Plan, subject to the terms of the Approved Plan and supervision of this Court.

17. The Court retains full jurisdiction over all activities of the Receiver and CRO and all persons and entities involved in implementation of the Approved Plan including, without limitation, for the purposes set forth in the Approved Plan.

18. To the extent that any of the above Conclusions of Law are more properly characterized as Findings of Fact, they are hereby deemed to be Findings of Fact.


DATED this ___1st___ day of October, 2009.


___s/ Michael R. Hogan___
United States District Judge


25 - FINDINGS OF FACT AND CONCLUSIONS OF LAW