MARC J. FAGEL (Cal. Bar No. 154425)
MARK P. FICKES (Cal. Bar No. 178570)
  fickesm@sec.gov
SUSAN L. LAMARCA (Cal. Bar No. 215231)
  lamarcas@sec.gov
MICHAEL E. LIFTIK (Cal. Bar No. 232430)
  liftikm@sec.gov
KASHYA K. SHEI (Cal. Bar No. 173125)
  sheik@sec.gov
SHEILA E. O'CALLAGHAN (Cal. Bar No. 131032)
   ocallaghans@sec.gov

Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
44 Montgomery Street, Suite 2600
San Francisco, California 94104
Telephone: (415) 705-2500
Facsimile: (415) 705-2501

FILED '09 DEC 09 10:34 USDC-ORE

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>vs.<br><br>SUNWEST MANAGEMENT, INC., CANYON CREEK DEVELOPMENT, INC., CANYON CREEK FINANCIAL, LLC, and JON M. HARDER,<br><br>Defendants,<br><br>and<br><br>DARRYL E. FISHER, J. WALLACE GUTZLER, KRISTIN HARDER, ENCORE INDEMNITY MANAGEMENT LLC, SENENET LEASING COMPANY, FUSE ADVERTISING, INC., KDA CONSTRUCTION, INC., CLYDE HAMSTREET, AND CLYDE A. HAMSTREET & ASSOCIATES, LLC,<br><br>Relief Defendants. | Case No. 09-CV-6056-HO<br><br>FINDINGS OF FACT AND CONCLUSIONS OF LAW IN SUPPORT OF SECURITIES AND EXCHANGE COMMISSION'S MOTION FOR SUMMARY JUDGMENT ON LIABILITY |

This matter came before the Court on Plaintiff Securities and Exchange Commission's ("Commission") motion for summary judgment pursuant to F.R.C.P. 56(d)(2). The Court has taken judicial notice of the Commission's complaint filed in this matter; the memorandum of points and authorities in support of the Commission's motion for summary judgment, and all evidence submitted with the motion for partial summary judgment; the Receiver's Distribution Plan, and all declarations and exhibits submitted in support thereof, the Court's findings fact and conclusions of law related to the Distribution Plan; and all other submissions, written or oral, at or before the hearing on the instant motion.

GOOD CAUSE appearing, the Court finds:

1. This Court has jurisdiction over the parties and the subject matter of this action, pursuant to Sections 20(d)(1) and 22(a) of the Securities Act of 1933 ("Securities Act"), and Sections 21(d)(3), 21(e), and 27 of the of the Securities Exchange Act of 1934 ("Exchange Act"). 15 U.S.C. §§ 77t(d)(1), 77v(a), 78u(d), and 78u(e).

2. This District is an appropriate venue for this action pursuant to Section 22(a) of the Securities Act and Section 27 of the Exchange Act. 15 U.S.C. §§ 77v(a) and 78aa.

3. The Commission has demonstrated that there is no dispute of material fact as to the following:

## BACKGROUND FACTS

4. Sunwest operates approximately two hundred senior housing facilities nationwide. At its peak in 2008, Sunwest had more than 280 facilities in approximately 34 states, and its management estimated that it had over $2,000,000,000 in asset value. (Declaration of Michael Liftik ("Liftik Decl."), Exhibit 10 at 4-5). Defendant Jon M. Harder ("Harder") is the founder and majority owner of Sunwest, and until around January 2009 when he resigned, he served as its President and CEO. (Liftik Decl., Ex. 1 at 13:21-14:6; Ex. 10 at 4).

5. Beginning in 2001 through June 2008, Sunwest offered to investors tenancy-in-common ("TIC") interests to facilitate the purchase of senior housing facilities managed by Sunwest. (Liftik Decl., Exs. 10 at 6; Ex. 15).

6. From 2001 through June 2008, Sunwest raised approximately $430,000,000 from investors. Approximately $300,000,000 of that amount was raised in and after January 2006.

7. In and after January 2006, most TIC offerings were structured and sold in a consistent manner. Harder formed Defendant Canyon Creek Development, Inc. ("CCD") on about March 28, 2001. CCD identified a property to be acquired and managed by Sunwest, and sponsored the TIC offering to potential investors. (Liftik Decl., Ex. 1 (Harder's sworn testimony to the Commission staff) at 24:8-26:1). Defendant CCD, with Harder's knowledge and assistance, offered ownership in the property to investors through TIC ownership interests. The remainder of the property was owned by a "Co-Owner," typically a limited liability company that was majority-owned by Harder. (Liftik Decl., Ex. 2). Funds raised from investors through TIC offerings were to be used as the down payment for the property, while the remainder of the purchase price was to be financed through a mortgage, with the Co-Owner as the borrower. (Liftik Decl., Ex. 2). Once the property was purchased, the TIC investors and Co-Owner leased the property to another Harder-owned LLC, called the "Operator" or "Master Tenant." The Master Tenant then subcontracted the property management duties to Sunwest, referred to as the "Property Manager." The Property Manager maintained complete control of the property's operations and finances. (Liftik Decl., Ex. 3 at 2). The TIC investors from whom the money was raised had no role in operating or managing the property. (Liftik Decl., Ex. 3 at 3).

8. Throughout the relevant period, Harder was the Vice President and Director of CCD and held a sixty percent (60%) controlling interest in CCD.

9. On about November 4, 2005, Harder formed Canyon Creek Financial, Inc. ("CCF") as a securities broker for the sole purpose of selling the TIC securities to investors either directly or through arrangements with third-party brokers. (Liftik Decl., Ex. 3 at 29-30). From 2005 through 2008, Harder considered the TIC interest offers and sales to be offers and sales of securities. CCF was registered with the Commission as a securities broker-dealer on June 22, 2006. Harder was the sole member and a broker-dealer salesperson for CCF and holds a one hundred percent (100%) controlling interest in CCF. CCF used various marketing materials, including Private Placement

Memorandums ("PPMs"), Executive Summaries, and Offering Memoranda to market the investment opportunity to potential investors. (Liftik Decl., Ex. 4). These marketing materials were, at times, distributed to potential investors through the United States Postal Service.

10. Through the PPMs, other materials, and occasional in-person meetings with investors, Harder emphasized certain points to investors including that investors were to be paid by Sunwest a return annually, described as "rent" due on the lease of their facility. Although various facilities offered differing rent payments, the typical payment was 10 percent of the investment paid annually.

11. At times, from 2005 to 2008, Harder identified cash flow positive facilities and cash flow negative facilities to facilitate transfers of money from one facility to another. Harder admitted this practice was central to Sunwest's business model. (Liftik Decl., Ex. 1 at 244:11-248:8).

## SPECIFIC FACTS

12. Sunwest, as the property manager of each TIC-funded facility, had complete control over each facility's finances. (Liftik Decl., Ex. 3 at 27). Because many of the facilities had low occupancy rates, high costs, or other financial challenges when acquired, one or more facilities' cash needs at times exceeded the cash generated. (Liftik Decl., Ex. 1 at 428:14-24). To deal with this shortfall, Sunwest arranged loans from facilities that had surplus cash for facilities that needed cash. (*Id.* at 285:17-288:6; Ex. 32 at 24:13-19). Harder admitted that cash transfers were made in response to "timing procedures" based on which facilities had cash on hand. (Liftik Decl., Ex. 1 at 172:15-23).

13. According to Sunwest's financial records, many of the retirement facilities remained cash flow negative for prolonged periods while payments were nonetheless made to TIC investors and other creditors. For the nine-month period ended September 30, 2008, 58 percent of homes had negative cash flow. (Fortunato Decl. at ¶ 4).

14. At times, Harder personally met with potential investors at the investors' request, or at the request of CCF, to discuss matters regarding existing or potential investments. (Liftik Decl., Ex. 1 at 40:22-45:6). During those meetings, Harder encouraged the investor or potential investor to purchase a TIC interest in a particular facility and, at times, represented that the potential TIC investment was limited only to the risks and benefits of an investment in only that particular facility.

SEC v. SUNWEST MANAGEMENT INC., ET AL.    4    FINDINGS OF FACT AND
CONCLUSIONS OF LAW IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT

15. During some of those in-person meetings, Harder omitted the fact that, in some cases, each facility's financial success depended upon the financial position of Sunwest because the operating capital of the facility in which they were investing might be loaned to other Sunwest facilities, whether the facility was operating at a cash profit or not. (Liftik Decl., Ex. 1 at 168:3-169:11). Harder did not disclose to some potential investors that, at times, Harder identified cash flow positive facilities and negative cash flow facilities and that he directed money transfers to be made from cash flow positive Sunwest facilities to negative cash flow Sunwest facilities and from negative cash flow Sunwest facilities to cash flow positive Sunwest facilities to ensure the facilities could meet financial obligations to residents, investors and creditors. (Liftik Decl., Ex. 1 at 244:11-248:8).

16. As a result of the money transfers between facilities, the TIC investments were not always limited to a particular facility, but were, at times intertwined with other facilities also managed by Sunwest. That material fact was necessary to make other statements made by Harder to potential investors not misleading.

17. According to at least one PPM, TIC investors should not have received their rent payments when the facility in which they invested was not economically successful. For example, at least one PPM stated that the "Master Tenant must be economically successful in order to pay your rent." (Liftik Decl., Ex. 5 at 13.) Despite whether a facility faced negative cash flow, TIC investors were paid their rent until approximately July 2008. (Liftik Decl. Ex. 1 at 35:18-25; Ex. 13).

18. One of the properties offered to TIC investors was called Victory Hills, in Kansas City, Missouri. (Liftik Decl. Ex. 6). Sunwest began operating Victory Hills in May 2007. According to Victory Hills' consolidated income statement for the twelve months ended December 31, 2007, each month Sunwest operated Victory Hills in 2007, the property operated at a net loss. In other words, although the property generated sufficient revenue to meet its operating expenses, each month in 2007, Victory Hills experienced a shortfall that did not leave it enough cash to make its debt service, interest expense, and TIC rent payments. In 2007, Victory Hills lost over $430,000.

19. Similarly, for each month that Sunwest operated Victory Hills through September 2008, Victory Hills failed to generate sufficient revenue to pay its debt service, interest expense and TIC rent payments. For the nine months ended September 30, 2008, Victory Hills lost over $440,000.

20. Despite the fact that Victory Hills lost money each month, rent payments were made to its TIC investors until July 2008. (Liftik Decl. Ex. 13.) That practice of paying rent when the property was failing was misleading to investors who believed that their investment was tied only to the property in which they had invested.

21. In order to fund Victory Hills TIC rent payments when it was not generating enough cash to make them, Harder caused other Sunwest-managed properties to transfer money to Victory Hills. According to Victory Hills General Ledger Trial Balance for the period ending December 31, 2007, Victory Hills received tens of thousands of dollars in loans from other Sunwest affiliated entities, including a $26,500 infusion from Harder. According to Victory Hills General Ledger Trial Balance for the period ending September 30, 2008, Harder's loans to Victory Hills had increased to $86,000.

22. Even though Victory Hills was not generating enough revenue to meet its financial obligations to its TIC investors, it was also actively lending money to other Sunwest-affiliated properties. For the period ending December 31, 2007, Victory Hills recorded notes receivable of at least $330,000 owed to it from approximately nineteen other Sunwest properties. By September 30, 2008, Victory Hills was owed over $500,000 from twenty-four different Sunwest properties.

23. By approximately late 2007, the nationwide credit crisis adversely impacted Sunwest's business model. Sunwest's ability to refinance substantially diminished, and Sunwest confronted problems funding the operations of various facilities. (Liftik Decl., Ex.10 at 7; Ex. 31 at 171:2-24). As a result, Sunwest began defaulting on some mortgages and lenders began placing facilities into receivership or foreclosure. Other lenders threatened to foreclose on properties unless Sunwest put into place cash controls, such as lock boxes, to prevent transfers of cash between facilities. (Liftik Decl., Ex. 10 at 8). By December 2007, Sunwest was in risk of default on loans to its largest creditor, GE Healthcare Financial Services ("GE"). (Liftik Decl., Ex. 19). Other creditors also invoked

penalty clauses that dramatically increased interest rates Sunwest was required to pay to obtain credit. (Liftik Decl., Ex. 10 at 8).

24. In 2008, CCD sponsored and CCF marketed the initial "Hawthorne Gardens Confidential Offering Memorandum," seeking to raise approximately $5 million to purchase a new facility for Sunwest to manage. (Liftik Decl., Ex. 26).[1] On about May 30, 2008, before the Hawthorne Gardens offering closed, Harder and others met with GE Healthcare Financial Services ("GE"), Sunwest's largest creditor, and were informed that GE intended to foreclose on at least a portion of its $590 million loan portfolio. (Liftik Decl., Ex. 1 at 158:11-160:22)

25. On about June 9, 2008, the Hawthorne Gardens offering closed, adding approximately $5 million of new investor money into the enterprise. (Liftik Decl., Ex. 27). Six months later, on about December 1, 2008, Hawthorne Gardens filed for bankruptcy as part of Sunwest's ultimate collapse. (Liftik Decl., Ex. 28) Before the Hawthorne Gardens investment opportunity closed on about June 9, 2008, Harder did not tell Hawthorne Gardens potential investors about the meeting with GE and the risk the GE foreclosure posed to the financial position of Sunwest. (Liftik Decl., Ex. 1 at 192:13-197:15). This omitted material information was necessary to make other statements not misleading.

## CONCLUSIONS OF LAW

26. Summary judgment should be entered whenever "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. Proc. 56(c). "Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. Proc. 1). Once the moving party has identified those portions of the record that show the absence of a genuine issue of material fact, the

---

[1] The February 12, 2008 Offering Memorandum for Hawthorne Gardens was amended and restated on May 28, 2008.

burden is on the opposing party to controvert that showing. *Id.* at 322. While the Commission bears the burden of setting forth the facts affirmatively showing that there is no genuine issue, that burden may be met by setting forth the admissions of the defendant. *Mourning v. Family Publications Service, Inc.*, 411 U.S. 356, 369, 362 n.16 (1973); see *SEC v. Spence & Green Chemical Co.*, 612 F.2d 896, 900-901 (5th Cir. 1980), cert. denied, 499 U.S. 1082 (1981) (finding grant of summary judgment in favor of SEC appropriate, based upon motion that was "well-supported" chiefly by admissions of a defendant). Where, as here, "the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Matsushita Elec. Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

27. Section 17(a) of the Securities Act prohibits fraud in the "offer or sale" of securities. 15 U.S.C. § 77q(a). Section 10(b) of the Exchange Act and Rule 10b-5 thereunder prohibit fraud "in connection with the purchase or sale" of securities. 15 U.S.C. § 78j(b); *see* 17 C.F.R. § 240.10b-5. These provisions prohibit: (1) employing any device, scheme or artifice to defraud; (2) making material misstatements of fact or omitting to state material facts necessary to make statements made not misleading; and (3) engaging in any act or practice that operates as a fraud. *See, e.g., SEC v. Dain Rauscher, Inc.*, 254 F.3d 852, 855-56 (9th Cir. 2001) (citing the antifraud provisions). Section 17(a)(2) requires additional proof that the defendant obtained "money or property" through the alleged misrepresentations. 15 U.S.C. § 77q(a)(2); *see Vernazza v. SEC*, 327 F.3d 851, 858 (9th Cir. 2003).

28. The nexus required by Section 10(b) and Rule 10b-5 between the alleged violative conduct and the purchase or sale of a security is satisfied if a scheme to defraud coincides with the purchase or sale of securities, whether or not accompanied by a particular misrepresentation or omission. *SEC v. Zandford*, 535 U.S. 813, 820-22 (2002); *SEC v. Berry*, 580 F. Supp. 2d 911, 923 (N.D. Cal. 2008) (citing to *Simpson v. AOL Time Warner Inc.*, 452 F.3d 1040, 1050-51 (9th Cir. 2006).

29. An investment contract is an investment of money in a common enterprise with the expectation of profits to be derived solely from the efforts of others. *SEC v. W. J. Howey Co.*,

328 U.S. 293, 298-99 (1946). Under the federal securities laws, "investment contracts" such as the TIC agreements sold or sponsored by Harder are securities. 15 U.S.C. § 77b(1) (defining "security" under the Securities Act); 15 U.S.C. § 78c(a)(10) (including "investment contract" in Exchange Act definition).

30. According to the Ninth Circuit, a "limited partnership generally is a security because, by definition, it involves investment in a common enterprise with profits to come solely from the efforts of others." *SEC v. Murphy*, 626 F.2d 633, 640-41 (9th Cir. 1980) (citing *Howey*, 328 U.S. at 301); *SEC v. Holschuh*, 694 F.2d 130, 137 (7th Cir. 1982) (concurring). Here, the TIC agreements supporting the investments in the Victory Hills facility and the Hawthorne Gardens facility created a relationship wherein the TIC investor in each facility invests in a common enterprise with all other TIC investors in the same facility. The TIC investors' expectations of returns came solely from the efforts of Harder and others. *See Steinhardt Group Inc. v. Citicorp*, 126 F.3d 144, 153 (3d Cir. 1997) (court should consider "the arrangements the parties made" in order to determine "who exercised control in generating profits."); *Matek v. Murat*, 862 F.2d 720, 724 (9th Cir. 1988) (advising that "form should not control over substance and the emphasis of the examination must be the economic reality of the transaction"). Thus, their TIC agreements are "investment contracts," and therefore securities.

31. Harder's specific misstatements and omissions in relation to the TIC investment agreements, as recited above in paragraphs 12 through 25 in this Order occurred in the offer and sale of securities, from which Harder and others received money or property. *See Vernazza*, 327 F.3d at 858.

32. Harder's specific misstatements and omissions, as recited above in paragraphs 12 through 25 in this Order were material to investors. Information is material if there is a substantial likelihood that disclosure of the misstated or omitted fact would have significantly altered the "total mix" of information available to a reasonable investor. *Basic Inc. v. Levinson,* 485 U.S. 224, 231-32 (1988) (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)). "Surely the materiality of information relating to financial condition, solvency and profitability is not subject to serious

challenge." *Murphy*, 626 F.2d at 653; *see Koehler v. Pulvers*, 614 F. Supp. 829, 842 (S.D. Cal. 1985) (finding that omissions and misrepresentations about "the use of investor funds" material).

33. Scienter is required to establish violations of Section 17(a)(1) of the Securities Act, and Section 10(b) of the Exchange Act, and Rule 10b-5 thereunder. *Aaron v. SEC*, 446 U.S. 680, 691, 696-97 (1980). In the Ninth Circuit, "scienter is satisfied by recklessness." *Dain Rauscher*, 254 F.3d at 856; *see Vernazza*, 327 F.3d at 860.

34. Harder's scienter may be inferred from his conduct in using the assets of the Victory Hills facility to pay the obligations of another facility and using the assets of another facility to pay obligations owed by the Victory Hills facility under circumstances that were misleading to investors in the Victory Hills facility as recited above. *See Webster v. Omnitron Int'l*, 79 F.3d 776, 785 (9th Cir. 1996). In addition, the evidence strongly suggests that Harder provided false information with respect to both the Victory Hills facility and the Hawthorne Gardens facility in the instances cited in paragraphs 12 through 25 above in this Order, and withheld material information in the instances cited in paragraphs 12 through 25 above in this Order, to investors in the PPMs and during in-person meetings.

35. Based on the foregoing, the Court finds that Harder violated Section 17(a) of the Securities Act, and Section 10(b) of the Exchange Act, and Rule 10b-5 thereunder. Accordingly,

I.

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that Defendant Jon M. Harder and his agents, servants, employees, attorneys-in-fact, and all persons in active concert or participation with them who receive actual notice of these Findings of Fact and Conclusions of Law by personal service or otherwise are permanently restrained and enjoined from violating, directly or indirectly, Section 10(b) of the Securities Exchange Act of 1934 [15 U.S.C. § 78j(b)] and Rule 10b-5 promulgated thereunder [17 C.F.R. § 240.10b-5], by using any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange, in connection with the purchase or sale of any security:

    (a)    to employ any device, scheme, or artifice to defraud;

    (b)    to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or

    (c)    to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.

II.

IT IS HEREBY FURTHER ORDERED, ADJUDGED, AND DECREED that Defendant Harder and his agents, servants, employees, attorneys-in-fact, and all persons in active concert or participation with them who receive actual notice of this Final Judgment by personal service or otherwise are permanently restrained and enjoined from violating Section 17(a) of the Securities Act of 1933 [15 U.S.C. § 77q(a)] in the offer or sale of any security by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly:

    (a)    to employ any device, scheme, or artifice to defraud;

    (b)    to obtain money or property by means of any untrue statement of a material fact or any omission of a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

    (c)    to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

//
//
//
//
//
//
//

III.

Pursuant to the agreement of the Commission and Harder, the Court will adjudicate the issue of civil monetary penalties and disgorgement at a later date.

IT IS SO ORDERED

Dated: December 9, 2009

Michael R. Hogan
United States District Court Judge

Agreed to as to form:

_____/s/ Mark P. Fickes_____
Mark P. Fickes
Attorney for Securities and Exchange Commission


_____/s/ Robert B. Miller_____
Robert B. Miller*
Attorney for Jon M. Harder


*Approval to sign received by counsel under whose ECF User ID this document was filed.