FILED '10 APR 22 15:51 USDC-ORE

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | Case No. 09-CV-6056-HO |
| Plaintiff, | FINDINGS OF FACT IN SUPPORT OF: ORDER GRANTING PRELIMINARY |
| vs. | INJUNCTION AND APPOINTING RECEIVER [REVISED AS REFERENCED IN ORAL ARGUMENT] [DOCKET NO. 64], |
| SUNWEST MANAGEMENT, INC., CANYON CREEK DEVELOPMENT, INC., CANYON CREEK FINANCIAL, LLC, and JON M. HARDER, | ENTERED UPON REMAND FOR ADEQUATE FINDINGS |
| Defendants, | |
| DARRYL E. FISHER, J. WALLACE GUTZLER, KRISTIN HARDER, ENCORE INDEMNITY MANAGEMENT, LLC, SENENET LEASING COMPANY, FUSE ADVERTISING, INC. KDA CONSTRUCTION, INC., CLYDE HAMSTREET, and CLYDE A . HAMSTREET & ASSOCIATES, LLC, | |
| Relief Defendants. | |

On March 2, 2009, the United States Securities and Exchange Commission (the

"Commission") filed its Complaint against Defendants Sunwest Management, Inc., Canyon

Creek Development, Inc., Canyon Creek Financial, LLC, and Jon M. Harder, and Relief

Defendants Darryl E. Fisher, J. Wallace Gutzler, Kristin Harder, Encore Indemnity Management,

LLC, Senenet Leasing Company, Fuse Advertising, Inc., KDA Construction, Inc., Clyde

Hamstreet, and Clyde A. Hamstreet & Associates, LLC, for violation of the federal securities

laws, injunctions against future violations and recoveries of restitution and penalties for the

violations.

On the same day, the Commission filed its application for a preliminary injunction and

appointment of a receiver (the "Application").  On March 3, 2009, the Court entered a temporary

restraining order.  On March 10, the Court entered an order that provides for, among other

things, the preliminary injunction and appointment of the Receiver (Dkt. No. 64, the "Receiver

Order").

In connection with the Receiver Order, the Court reviewed and considered plaintiff's

Complaint and the papers submitted by plaintiff in support of the Application, including the

Fortunato Declaration (Dkt. No. 7) and the Liftik Declaration (Dkt. Nos. 8, 9, 21, and 22).  The

Court also received and considered the papers submitted by the parties as well as oral

submissions made at the hearings on March 2 and March 10, 2009.

Based on the foregoing, the Court makes the findings of fact set forth below and finds

that a proper showing, as required by Section 20(b) of the Securities Act, and Section 21(d) of

the Exchange Act, has been made for the relief granted in the Receiver Order because it appears

that appointment of a receiver and the other relief provided therein is necessary to preserve the

property and assets of the receivership estate and the Receivership Entities,[1] to ascertain the

extent of commingling of funds among the Defendants, Relief Defendants, Receivership Entities,

and all entities they control or in which they have an ownership interest (the "Sunwest

Enterprise"), to ascertain the true financial condition of the Receivership Entities and the

disposition of investor funds, to prevent further dissipation of the property or assets of the

receivership estate and the Receivership Entities, to prevent the encumbrance or disposition of

---

[1]   Capitalized terms not defined herein shall have the meaning set forth in the Receiver Order.

FINDINGS OF FACT AND CONCLUSIONS
OF LAW IN SUPPORT OF ORDER
GRANTING PRELIMINARY INJUNCTION

the property or assets of the receivership estate and the Receivership Entities, to preserve the books, records, and documents of the Receivership Entities, and to be available to respond to investor inquiries.

## SUMMARY OF THE COMMISSION'S INVESTIGATION AND ALLEGATIONS

The Commission alleged that the Defendants, who in large part controlled the Receivership Entities pre-receivership, engaged in a massive fraud that led to losses of hundreds of millions of dollars to investors and creditors as well. The Commission further alleged that investors were told that they were purchasing ownership interests for a specific real property that would generate enough profit to pay a fixed promised annual return, and that the Sunwest Enterprise had a history of never missing a payment. These representations, according to the Commission, were false and concealed the true nature of the investments and the risk to investors from the Sunwest Enterprise's precarious financial position.

The Commission further alleged that, contrary to representations by Defendants that investors were obtaining an interest in a specific real property which would generate a steady income stream, Defendants ran the Sunwest Enterprise as an integrated enterprise, commingling investor and creditor funds and operational revenue into essentially a single fund, often funneled through the bank accounts of Defendant Harder, from which operating expenses and investor returns were paid. Furthermore, the Commission alleged that, contrary to Defendants' representations, including written representations and marketing pitches, the Sunwest Enterprise paid some investors and some creditors steady returns on their investments and claims, not from successful management of a particular real property asset, but from cash generated in the operations of other real property assets and from funds obtained by refinancings, from loans from Defendant Harder and certain Harder creditors, and from funds raised through offerings to new investors. The Commission alleged that these facts were not disclosed to, or known by, investors and constituted securities fraud.

According to the Commission, by June 2008, the Defendants operated the Sunwest Enterprise virtually as a Ponzi scheme: money raised in the final offerings (represented to be for

FINDINGS OF FACT AND CONCLUSIONS
OF LAW IN SUPPORT OF ORDER
GRANTING PRELIMINARY INJUNCTION

new real property assets) was used to pay old investors and creditors their promised return and payments and otherwise fund existing operations and other real property assets. The Commission accuses Defendants or Harder of reporting income to investors and creditors that was partially or wholly fictitious. The Commission also contends that, despite the Sunwest Enterprise's dire financial situation, Defendant Harder misappropriated tens of millions of dollars, and the Relief Defendants were the recipients of substantial ill gotten gains. The Commission contends that as a result of this conduct, as of January 2009, over 100 real properties operated by SMI were in jeopardy of foreclosure, and in or headed into receiverships or bankruptcy cases.

According to the Commission, these allegations are based on a thorough investigation of SMI's records and depositions and interviews of various SMI insiders, including Defendant Harder, and of investors and others.

A.    **BACKGROUND OF THE SUNWEST ENTERPRISE**

1       The Commission alleges that the Sunwest Enterprise operates approximately two hundred senior housing facilities nationwide. The Sunwest Enterprise also controlled and managed other investments, including real property both related and unrelated to the assisted living facilities. At its peak in 2008, the Sunwest Enterprise involved more than 280 facilities in approximately 34 states, and its management estimated that it had over $2,000,000,000 in asset value. (Declaration of Michael Liftik ("Liftik Decl."), Exhibit 10 at 4-5).

2       Defendant Jon M. Harder ("'Harder") is the founder and majority owner of Sunwest Management, Inc. ("SMI"), and until around January 2009 when he resigned, he served as its President and CEO. (Liftik Decl., Ex. 1 at 13321-1416; Ex. 10 at 4).

B.    **SOLICITATION OF INVESTMENTS IN THE SUNWEST ENTERPRISE**

3       The Commission alleges that beginning in 2001 through June 2008, Sunwest offered to investors tenancy-in-common ("TIC") real property interests to facilitate the purchase of senior housing facilities managed by Sunwest. (Liftik Decl., Exs. 10 at 6; Ex. 15). Hundreds of millions of dollars in new investments were raised, without disclosures to investors of material

FINDINGS OF FACT AND CONCLUSIONS
OF LAW IN SUPPORT OF ORDER
GRANTING PRELIMINARY INJUNCTION

information about the Sunwest Enterprise. From 2001 through June 2008, Sunwest raised approximately $430,000,000 from investors. Approximately $300,000,000 of that amount was raised in and after January 2006. In and after January 2006, most TIC offerings were structured and sold in a consistent manner, as described below.

4   Harder formed Defendant Canyon Creek Development, Inc. ("CCD") on about March 28, 2001. Throughout the relevant period, Harder was the Vice President and Director of CCD and held a sixty percent (60%) controlling interest in CCD. CCD identified a property to be acquired and managed by Sunwest, and sponsored the TIC offering to potential investors. (Liftik Decl., Ex. 1 (Harder's sworn testimony to the Commission staff) at 24:8-26: 1). Defendant CCD, with Harder's alleged knowledge and assistance, offered ownership in the property to investors through TIC ownership interests. The remainder of the property was owned by a "Co-Owner," typically a limited liability company that was majority-owned by Harder. (Liftik Decl., Ex. 2). Funds raised from investors through TIC offerings were to be used as the down payment for the property, while the remainder of the purchase price was to be financed through a mortgage, with the Co-owner as the borrower. (Liftik Decl., Ex. 2). Once the property was purchased, the TIC investors and Co-Owner leased the property to another Harder-owned LLC, called the "Operator" or "Master Tenant." The Master Tenant then subcontracted the property management duties to Sunwest, referred to as the "Property Manager." The Property Manager maintained complete control of the property's operations and finances. (Liftik Decl., Ex. 3 at 2). The TIC investors from whom the money was raised had no role in operating or managing the property. (Liftik Decl., Ex. 3 at 3).

5   On about November 4, 2005, Harder formed Canyon Creek Financial, Inc. ("CCF") as a securities broker for the sole purpose of selling the TIC securities to investors either directly or through arrangements with third-party brokers. (Liftik Decl., Ex. 3 at 29-30). From late 2005 through 2008, Harder considered the TIC interest offers and sales to be offers and sales of securities. CCP was registered with the Commission as a securities broker-dealer on June 22, 2006. Harder was the sole member and a broker-dealer salesperson for CCF and holds

FINDINGS OF FACT AND CONCLUSIONS
OF LAW IN SUPPORT OF ORDER
GRANTING PRELIMINARY INJUNCTION

a one hundred percent (100%) controlling interest in CCF. CCF used various marketing materials, including Private Placement Memoranda ("PPMs"), Executive Summaries, and Offering Memoranda to market the investment opportunity to potential investors. (Liftik Decl., Ex. 4). These marketing materials were, at times, distributed to potential investors through the United States Postal Service.

6       Through the PPMs, other materials, and occasional in-person meetings with investors, Harder emphasized certain points to investors including that investors were to be paid a return annually, described as "rent" due on the lease of their specific facility. Although various facilities offered differing rent payments, the typical payment was 10 percent of the investment paid annually.

## C.    USE OF FUNDS WITHIN THE SUNWEST ENTERPRISE

7       The Commission alleges that the Sunwest Enterprise, was managed as a unitary enterprise that generally did not respect the separateness of the Receivership Entities nor the restricted purposes of invested funds that were intended to be limited to use for specific facilities. At times, from 2005 to 2008, Harder identified cash flow positive facilities and cash flow negative facilities to facilitate transfers of money from one facility to another. Harder admitted this practice was central to the Sunwest Enterprise's business model. (Liftik Decl., Ex. 1 at 244:11-248:8).

8       SMI, as the property manager of each TIC-funded facility, had complete control over each facility's finances. (Liftik Decl., Ex. 3 at 27). Because many of the facilities had low occupancy rates, high costs, or other financial challenges when acquired, one or more facilities' cash needs at times exceeded the cash generated. (Liftik Decl., Ex. I at 428: 14-24). To deal with this shortfall, SMI transferred funds from facilities that had surplus cash for facilities that needed cash. (Liftik Decl., at 28517-288:6; Ex. 32 at 24: 13-19). Harder admitted that cash transfers were made in response to "timing procedures" based on which facilities had cash on hand. (Liftik Decl., Ex. 1 at 172: 15-23).

9        According to SMI's financial records, many of the retirement facilities remained
cash flow negative for prolonged periods while payments were nonetheless made to TIC
investors and other creditors.  For the nine-month period ended September 30, 2008, 58 percent
of facilities had negative cash flow. (Fortunato Decl. at ¶ 4).

D.    **OMISSIONS IN SOLICITATION OF INVESTMENTS**

10        The Commission alleges that, at times, Harder personally met with potential
investors at the investors' request, or at the request of CCF, to discuss matters regarding existing
or potential investments. (Liftik Decl., Ex. 1 at 40:22-456).  During those meetings, Harder
encouraged the investor or potential investor to purchase a TIC interest in a particular facility
and, at times, represented that the potential TIC investment was limited only to the risks and
benefits of an investment in only that particular facility.

11        During some of those in-person meetings, Harder omitted the fact that, in some
cases, each facility's financial success depended upon the financial position of the Sunwest
Enterprise because the operating capital of the facility in which they were investing might be
loaned to other facilities, whether the facility was operating at a cash profit or not.  (Liftik Decl.,
Ex. 1 at 168:3-169: 11).  Harder did not disclose to some potential investors that, at times,
Harder identified cash flow positive facilities and negative cash flow facilities and that he
directed money transfers to be made from cash flow positive facilities to negative cash flow
facilities and from negative cash flow facilities to cash flow positive facilities to ensure the
facilities could meet financial obligations to residents, investors and creditors.  (Liftik Decl., Ex.
1 at 244:11-248:8).

12        As a result of the money transfers between facilities, the TIC investments were
not always limited to a particular facility but were, at times, intertwined with other facilities also
managed by SMI.  That material fact was necessary to make other statements made by Harder to
potential investors not misleading.

FINDINGS OF FACT AND CONCLUSIONS
OF LAW IN SUPPORT OF ORDER
GRANTING PRELIMINARY INJUNCTION

E.    **"RENT" PAYMENT TO TIC INVESTORS**

13    The Commission alleges that according to at least one PPM, TIC investors should

not have received their rent payments when the facility in which they invested was not

economically successful. For example, at least one PPM stated that the "Master Tenant must be

economically successful in order to pay your rent." (Liftik Decl., Ex. 5 at 13.) Despite whether

a facility faced negative cash flow, TIC investors were paid their rent until approximately July

2008. (Liftik Decl. Ex. 1 at 35:18-25; Ex. 13).

14    SMI, as the property manager of each TIC-funded facility, had complete control

over each facility's finances. (Liftik Decl. Ex. 3 at 27). Because many of the facilities had low

occupancy rates, high costs, or other financial challenges, their cash needs exceeded the cash

they generated. (Liftik Decl. Ex. 1 at 428:14-24).

15    One of the properties offered to TIC investors was called Victory Hills, in Kansas

City, Missouri. (Liftik Decl. Ex. 6). SMI began operating Victory Hills in May 2007. (Liftik

Decl. Ex. 6). According to Victory Hills' consolidated income statement for the twelve months

ended December 31, 2007, each month SMI operated Victory Hills in 2007, the property

operated at a net loss. (Fortunato Decl., ¶¶ 49-50, Ex. 13). In other words, although the property

generated sufficient revenue to meet its operating expenses, each month in 2007, Victory Hills

experienced a shortfall that did not leave it enough cash to make its debt service, interest

expense, and TIC rent payments. In 2007, Victory Hills lost over $430,000. (Fortunato Decl.

Ex. 13).

16    Despite the fact that Victory Hills lost money each month, rent payments were

made to its TIC investors until July 2008. (Liftik Decl. Ex. 13.) That practice of paying rent

when the property was failing was misleading to investors who believed that their investment

was tied only to the property in which they had invested.

F.    **THE SUNWEST ENTERPRISE COMES UNDER FINANCIAL DISTRESS**

17    The Commission alleges that the Sunwest Enterprise experienced critical cash

flow problems arising from the overleveraging of properties, lower than industry standard

occupancy, and disruption in the capital markets. This has caused the Sunwest Enterprise to be in severe financial distress for the past two years, and has led to hundreds of millions of dollars in investment losses, primarily to individual investors who had intended to restrict their investments to specific facilities. (Liftik Decl., Ex. 10 at 7; Ex. 3 1 at 171:2-24).

18    As a result, Receivership Entities began defaulting on some mortgages and lenders began placing facilities into receivership or foreclosure. Other lenders threatened to foreclose on properties unless cash controls were put into place, such as lock boxes, to prevent transfers of cash between facilities. (Liftik Decl., Ex. 10 at 8). By December 2007, the Sunwest Enterprise was in risk of default on loans to its largest creditor, GE Healthcare Financial Services ("GE"). (Liftik Decl., Ex. 19). Other creditors also invoked penalty clauses that dramatically increased interest rates required to obtain credit. (Liftik Decl., Ex. 10 at 8).

## G.    CONTINUED SOLICITATION OF INVESTMENTS

19    The Commission alleges that in 2008, CCD sponsored and CCF marketed the initial "Hawthorne Gardens Confidential Offering Memorandum," seeking to raise approximately $5 million to purchase a new facility for SMI to manage. (Liftik Decl., Ex. 26). On about May 30, 2008, before the Hawthorne Gardens offering closed, Harder and others met with GE Healthcare Financial Services ("GE"), the Sunwest Enterprise's largest creditor, and were informed that GE intended to foreclose on at least a portion of its $590 million loan portfolio. (Liftik Decl., Ex. 1 at 158: 11-160:22).

20    On about June 9, 2008, the Hawthorne Gardens offering closed, adding approximately $5 million of new investor money into the enterprise. (Liftik Decl., Ex. 27). Six months later, on about December 1, 2008, Hawthorne Gardens filed for bankruptcy as part of the Sunwest Enterprise's ultimate collapse. (Liftik Decl., Ex. 28). Before the Hawthorne Gardens investment opportunity closed on about June 9, 2008, Harder did not tell Hawthorne Gardens potential investors about the meeting with GE and the risk the GE foreclosure posed to the financial position of Sunwest. (Liftik Decl., Ex. 1 at 192: 13-197:15). This omitted material information was necessary to make other statements not misleading.

## A PRELIMINARY INJUNCTION AND APPOINTMENT OF A RECEIVER ARE NECESSARY AND APPROPRIATE

21 The Court has considered all the evidence presented to it and finds that there is substantial evidence of the Sunwest Enterprise procuring and transferring funds in a manner without the prior knowledge or consent of investors and creditors, and in a manner inconsistent with the representations to investors and creditors. That, coupled with the evidence that the Sunwest Enterprise decided how and where to use funds on a "who-needs-the cash now" basis supports the issuance of a preliminary injunction, appointment of a receiver, and the related relief as set forth in the Receiver Order. After review of all the facts and circumstances currently known to the Court, the Court finds that there was enough probability of success by the Commission on its Complaint for the Court to issue the Receiver Order. Accordingly, this Court entered the Receiver Order in response to the Complaint and allegations of the Commission, the dire financial circumstances facing many of the Receivership Entities, the continuing losses being experienced and threatened to the detriment of investors and creditors, and the support of Defendants, Relief Defendants and fiduciaries of relevant constituencies.

Dated: _22 April 2010_

Hon. Michael R. Hogan
Judge, United States District Court

FINDINGS OF FACT AND CONCLUSIONS
OF LAW IN SUPPORT OF ORDER
GRANTING PRELIMINARY INJUNCTION